# United States Court of Appeals
## For the First Circuit

Nos. 08-2027, 08-2028

ANA I. ALVARADO-SANTOS,

Plaintiff, Appellee/Cross-appellant,

v.

DEPARTMENT OF HEALTH OF THE COMMONWEALTH OF PUERTO RICO,

Defendant, Appellant/Cross-appellee;

JOHNNY RULLÁN, HÉCTOR MENA-FRANCO, and
FRANCISCO RODRÍGUEZ-PICHARDO,

Defendants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Camille L. Velez-Rivé, U.S. Magistrate Judge]

Before
Lynch, Chief Judge,
Boudin and Lipez, Circuit Judges.

José Enrico Valenzuela-Alvarado, Assistant Solicitor General,
with whom Irene S. Soroeta-Kodesh, Solicitor General, Leticia
Casalduc-Rabell, Deputy Solicitor General, and Zaira Z. Girón-
Anadón, Deputy Solicitor General, were on brief, for
appellant/cross-appellee.
Lorenzo J. Polomares-Starbuck, with whom Raymond Sanchez
Maceira and Lorenzo Palomares, P.S.C., were on brief, for
appellee/cross-appellant.

September 8, 2010

**LIPEZ, Circuit Judge**. Plaintiff Ana I. Alvarado-Santos (Alvarado-Santos) obtained a favorable jury verdict on her claims of national origin and gender discrimination under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e-2. Defendant Department of Health of the Commonwealth of Puerto Rico (Department of Health), her former employer, appeals from the judgment. The Department of Health contends that it is entitled to judgment as a matter of law or, in the alternative, to a new trial on the grounds that the evidence at trial was insufficient to support the verdict, that plaintiff's counsel made improper and prejudicial comments in closing argument, and that the award of $300,000 in compensatory damages was grossly excessive. Alvarado-Santos cross-appeals, arguing that she was entitled to an award of front pay in addition to compensatory damages and back pay.

After careful consideration, we conclude that the evidence is insufficient to support a finding of national origin or gender discrimination. Accordingly, we reverse and enter judgment for the Department of Health.

**I.**

**A. Factual Background**

We recite the relevant facts in the light most favorable to the jury verdict. Visible Sys. Corp. v. Unisys Corp., 551 F.3d 65, 69 (1st Cir. 2008).

Alvarado-Santos, a native of Puerto Rico, is a physician specializing in family medicine. After working as the medical director of a psycho-social treatment center for adolescents for some time, she applied for a job with the Correctional Health Services Program of the Department of Health. On April 10, 2002, Alvarado-Santos entered into a professional services contract with the Correctional Health Services Program to work as an Admissions Director at the Rio Piedras Correctional Complex.[1] In that position, she supervised a team of medical and support staff and oversaw the medical screening and evaluation of inmates admitted to the correctional complex. Alvarado-Santos' initial contract with the Department of Health extended through June 30, 2002. Her contract was renewed for the year beginning July 1, 2002, and was again renewed for the year beginning July 1, 2003.

In the fall of 2003, the Admissions Center where Alvarado-Santos worked in Rio Piedras was closed and the health services that had been offered there were moved to the Bayamón Correctional Complex. All of the personnel who had worked at the Rio Piedras Admissions Center, including Alvarado-Santos, were

---

[1] During the period relevant to this case, the United States District Court for the District of Puerto Rico was exercising supervisory authority over the Correctional Health Services Program as well as other aspects of the Puerto Rican correctional system. This supervision is the result of "a long-running inmate class action" commonly known as the Morales Feliciano case, which dates back to 1979. Torres-Arroyo v. Rullan, 436 F.3d 1, 3 & n.1 (1st Cir. 2006) (citing district court and First Circuit opinions addressing the class action).

transferred to Bayamón. On October 1, 2003, Alvarado-Santos' 2003-2004 contract was amended to reflect her transfer.

After the transfer of the Rio Piedras health services and personnel to Bayamón, the Bayamón Correctional Complex had two Admissions Centers for inmate health services: Admissions Center 308 and Admissions Center 705.[2] Alvarado-Santos directed the provision of health services at Admissions Center 705, while Marcos Devarie, a male physician originally from Puerto Rico, directed Admissions Center 308. Devarie had first begun working for the Correctional Health Services Program in 1991 and had been the director of Admissions Center 308 in Bayamón since 1997.

Doctor Francisco Rodríguez-Pichardo, the Director of Clinical Services at the Bayamón Correctional Complex and a native of the Dominican Republic, was Alvarado-Santos' immediate supervisor in Bayamón. Some time after October 1, 2003, an office clerk who worked at Admissions Center 705 overheard Rodríguez-Pichardo saying that "Dominican doctors were better" than "the other physicians who were there, who were Puerto Rican." One physician working at Admissions Center 705 described Rodríguez-Pichardo as a "hard" and "aggressive" person.

When Alvarado-Santos first began working in Bayamón in October 2003, Admissions Center 705 did not yet have certain

---

[2] The Admissions Centers were so-named because Admissions Center 308 could accommodate 308 inmates as patients, while the larger Admissions Center 705 could accommodate 705 inmates.

equipment, such as an x-ray machine and land-line phone service. The center received an x-ray machine and phone service in January 2004. In the months before Admissions Center 705 was fully equipped, physicians working at the center were given mobile phones for emergency calls and inmates in need of x-rays were transported to Admissions Center 308. Admissions Center 705 also did not have a "medical cadre," a group of custody officials assigned by the Corrections Administration to monitor inmates, although the center did have some security officials assigned by the Corrections Administration.[3] During this period, Admissions Center 308 had a working x-ray machine, phone service, and a medical cadre.

Following the transfer to Bayamón, Alvarado-Santos had a series of difficulties with her supervisor, Rodríguez-Pichardo. Prior to the October 1, 2003 transfer, the October medical shift schedule for Admissions Center 705 had already been prepared by Gualberto Guerrero, a physician originally from the Dominican Republic who had been preparing the shift schedule for years. After the transfer, Alvarado-Santos modified the October shift schedule, redistributing the medical shifts. For example, she removed several shifts from Guerrero and two other physicians, Bernarda Cuevas and Juan Velez. She instead increased the number of shifts assigned to a male physician, Dr. Ortiz, and gave shifts

---

[3] As part of a pilot program, the Corrections Administration assigned a "medical cadre" to some, but not all, admissions centers.

to two female physicians, Drs. Diaz and Pagan, who had not had any shifts in the original schedule prepared by Guerrero.

As a result of the altered shift schedule, Guerrero, Velez and Cuevas complained to Rodríguez-Pichardo that Alvarado-Santos had taken away some of their regular shifts without notice. After comparing the October shift schedule with previous schedules, Rodríguez-Pichardo confirmed that Alvarado-Santos had taken away regular shifts from the physicians who had lodged complaints. Without discussing the matter with Alvarado-Santos, Rodríguez-Pichardo returned several shifts to the complaining physicians and removed the additional shifts Alvarado-Santos had given to Ortiz, Diaz and Pagan, so that the distribution of shifts resembled the original schedule prepared by Guerrero.[4] Rodríguez-Pichardo also ordered Guerrero to continue preparing the shift schedule for Admissions Center 705, instead of Alvarado-Santos. Devarie, director of Admissions Center 308, prepared the medical shift schedule for his center.

_____

[4] As a result of all of these changes, the number of female physicians assigned to shifts on the October schedule decreased. The original October shift schedule prepared by Guerrero before the transfer assigned shifts to two female physicians, Cuevas and another physician, Rivera; Rivera, however, chose not to continue working medical shifts after the move to Bayamón. The schedule prepared by Alvarado-Santos after the transfer assigned shifts to three female physicians, Cuevas, Diaz, and Pagan. The final schedule approved by Rodríguez-Pichardo assigned shifts to one female physician, Cuevas.

Rodríguez-Pichardo also ordered some personnel working in Admissions Centers 308 and 705 to report to a centralized supervisor rather than their respective Admissions Directors. For example, he ordered all nursing personnel to report to the Director of Nursing, medical records personnel to report to the Director of Medical Records, and radiology technicians to report to the Health Services Administrator.

At some time after the transfer, Alvarado-Santos complained to Rodríguez-Pichardo that two physicians, Guerrero and Patricia López, both from the Dominican Republic, were falsifying their time entries for payroll purposes. After investigating the complaint, Rodríguez-Pichardo concluded that there was no falsification or alteration in the time records and, without talking to Alvarado-Santos, he dismissed her complaint. Although Guerrero ordinarily submitted his time records to Alvarado-Santos for approval, after this incident Rodríguez-Pichardo directed Guerrero to submit his time records directly to the human resources employee in charge of payroll, thereby bypassing Alvarado-Santos. Rodríguez-Pichardo did not order any of the physicians supervised by Devarie to submit their time records directly to human resources; instead, those physicians continued to submit their time records to Devarie for approval.

In March 2004, Alvarado-Santos was told by a Correctional Health Services Program staff person that she had been chosen to go

to a medical training program in New York.  She never attended the training, however, because Rodríguez-Pichardo informed her that he preferred to send Devarie.  Rodríguez-Pichardo also did not invite her to attend all monthly staff meetings.

On May 26, 2004, Alvarado-Santos received a letter from Hector Mena-Franco, the Executive Director for the Correctional Health Services Program and a native of the Dominican Republic, stating that her contract expired on June 30, 2004 and would not be renewed for the 2004-2005 year.  After Alvarado-Santos requested further explanation of the reasons for the nonrenewal, Mena-Franco responded as follows:

> During the current fiscal year the Rio Piedras Correctional Complex's Admissions Center, where you were providing services as a Director, was closed.  It should be pointed out that the Program had no say in the decision on this matter.  For that reason it was necessary to [amend] the contract between the parties to state for the record that the services would be provided in the Bayamón Correctional Complex, and the effective term thereof remained unaltered.
>
> In view of the restructuring of the Bayamón Correctional Complex, we have found it necessary to integrate the Admissions service to create consistency with the operating structure in all the correctional complexes. Every Correctional Complex has a single director for services since we cannot justify the duplication of services, and this violates compliance and uniformity.

At trial, Mena-Franco explained that he made the final decision not to renew Alvarado-Santos' contract upon the

recommendation of Rodríguez-Pichardo. Mena-Franco and Rodríguez-Pichardo both testified that they decided not to renew her contract based on a combination of two factors. First, after the transfer of services from Rio Piedras, they needed to restructure the Bayamón Correctional Complex so that both Admissions Centers were under the authority of one Admissions Director. Second, according to monthly reports over the period from October 2003 - May 2004, Alvarado-Santos' Admission Center 705 routinely had much lower compliance rates in treating inmates according to certain time tables and standards than Devarie's Admission Center 308. These compliance reports reflected how well the Admissions Center met established goals related to the provision of health services to inmates.

After Alvarado-Santos' contract was not renewed, both Admissions Centers at the Bayamón Correctional Complex were placed under the supervision of Devarie.

**B. Proceedings in the District Court**

1. Trial

In September 2004, Alvarado-Santos filed suit against the Department of Health and several individual defendants, including Rodríguez-Pichardo and Mena-Franco. Her complaint alleged that the defendants chose not to renew her contract on the basis of her gender and national origin in violation of Title VII, 42 U.S.C. § 2000e-2, and related provisions of Puerto Rico law. Following

the dismissal of her Puerto Rico law claims and her Title VII claims against the individual defendants, Alvarado-Santos proceeded to trial on her Title VII gender and national origin discrimination claims against the Department of Health. By the consent of the parties, a magistrate judge presided over the jury trial. See 28 U.S.C. § 636(c).

At the close of a week-long jury trial, plaintiff's counsel made several comments in closing argument about the relationship in Puerto Rico between Puerto Ricans and Dominicans that the Department of Health contends on appeal were improper and prejudicial. The Department did not lodge a contemporaneous objection to the comments. The Department of Health did lodge an objection after plaintiff's counsel stated that the jury should issue a verdict of at least $2.5 million, which the court overruled.

The jury found the Department of Health liable for gender and/or national origin discrimination and awarded Alvarado-Santos $1.25 million in compensatory damages. The jury verdict form asked whether the jury found "that the Department of Health did not renew Dr. Ana I. Alvarado Santos' contract due to her gender or national origin," and the jury answered in the affirmative. Thus we cannot be certain whether the jury verdict rested on a finding of national origin discrimination, gender discrimination, or both.

2. Post-trial motions

Both parties filed post-trial motions. Alvarado-Santos moved to alter or amend the judgment pursuant to Fed. R. Civ. P. 60(b), requesting that the $1.25 million compensatory damages award be reduced to $300,000 in accordance with the applicable statutory cap. 42 U.S.C. § 1981a(b)(3)(D). She requested an additional award of $377,441.30 in back pay and $572,558.70 in front pay. The Department of Health filed a renewed motion for judgment as a matter of law under Fed. R. Civ. P. 50(b), arguing, inter alia, that no reasonable jury, on the evidence presented, could conclude that Alvarado-Santos' contract was not renewed based on her sex or national origin. It also moved for a new trial or remittitur under Fed. R. Civ. P. 59, contending that the verdict was against the weight of the evidence, the damages award was grossly excessive, and a new trial was required due to plaintiff's counsel's inflammatory remarks during closing argument. Finally, in response to plaintiff's motion to amend the judgment, the Department of Health agreed that the compensatory damages award should be reduced to no more than $300,000 based on the statutory cap, but opposed her request for additional awards of back and front pay.

The district court denied the Department of Health's motions for judgment as a matter of law and for a new trial or remittitur. It granted in part Alvarado-Santos' motion to amend the verdict, reducing the compensatory damages award to $300,000 in

accordance with the statutory cap, awarding the requested $377,441.30 in back pay, but denying the requested award of front pay. The court therefore entered judgment in favor of Alvarado-Santos and awarded damages in the amount of $677,441.30.

This timely appeal and cross-appeal followed.

## II.

The Department of Health raises several contentions on appeal. It argues: (1) that the evidence was insufficient to support the jury's determination that Alvarado-Santos' contract was not renewed based on her gender and/or national origin, (2) that the evidence was insufficient to support a jury finding that Alvarado-Santos was an employee of the Department of Health, as opposed to an independent contractor, (3) that plaintiff's counsel made inflammatory and prejudicial comments in closing argument that require a new trial, and (4) that the $300,000 compensatory damages award was grossly excessive. We agree that, based on the evidence presented at trial, no reasonable jury could find that the nonrenewal of Alvarado-Santos' contract was based on her gender and/or national origin. We therefore conclude that the Department of Health is entitled to judgment as a matter of law. In light of this conclusion, we need not reach the Department of Health's remaining contentions.

We review the court's denial of a renewed motion for judgment as a matter of law de novo. Valentín-Almeyda v.

-12-

Municipality of Aguadilla, 447 F.3d 85, 95 (1st Cir. 2006). We review the evidence in the light most favorable to the verdict and may reverse only if no reasonable person could have reached the conclusion arrived at by the jury. Id. at 95-96.

The jury was instructed to evaluate Alvarado-Santos' claims of gender and national origin discrimination under the McDonnell Douglas burden-shifting framework. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this framework, the plaintiff must first establish a prima facie case of discrimination. See Lockridge v. Univ. of Me. Sys., 597 F.3d 464, 470 (1st Cir. 2010). The prima facie case varies according to the nature of the plaintiff's claim but it requires, among other things, a showing of an adverse employment action. Id. After the plaintiff has made this prima facie showing, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Id. If the employer meets its burden, the focus then shifts back to the plaintiff to show, "by a preponderance of the evidence, that the employer's articulated reason for the adverse employment action is pretextual and that the true reason for the adverse action is discriminatory." Id.

As to both the gender and national origin discrimination claims, we assume arguendo that Alvarado-Santos met her burden to establish a prima facie case. At trial, the Department of Health,

-13-

in turn, met its burden to articulate a legitimate nondiscriminatory reason for the contract nonrenewal. The Department of Health offered evidence that it needed to place both Admissions Centers in Bayamón under the authority of one Admissions Director to achieve greater uniformity and efficiency, and it chose Devarie for that position over Alvarado-Santos due to the better compliance record at the center run by Devarie. Our focus is therefore on the ultimate question: whether the evidence set forth at trial would enable a reasonable jury to find that the Department of Health's proffered nondiscriminatory reasons are pretextual and Alvarado-Santos' contract was in fact not renewed because of her gender and/or national origin. See id.

## A. National Origin Discrimination

As we described above, the Department of Health offered testimony from both Mena-Franco and Rodríguez-Pichardo that they needed to consolidate the two Admissions Centers in Bayamón under the leadership of one Admissions Director, and that they chose Devarie to fill that role rather than Alvarado-Santos because his Admission Center had a better compliance record. In an effort to meet her burden to show that, in fact, discriminatory animus based on her national origin motivated the employment decision, Alvarado-Santos relied entirely on evidence of two facts: (1) the supervisors who participated in the decision to not renew her contract, Mena-Franco and Rodríguez-Pichardo, are both originally

-14-

from the Dominican Republic, whereas she was born in Puerto Rico, and (2) at some point after the October 1, 2003 transfer to Bayamón, Rodríguez-Pichardo commented that Dominican doctors are better than Puerto Rican doctors. Importantly, however, Alvarado-Santos conceded at trial that Devarie, the person that Mena and Rodríguez-Pichardo chose to direct both Admissions Centers in Bayamón, was Puerto Rican, not Dominican.

In addition, Alvarado-Santos offered no evidence that Rodríguez-Pichardo's isolated remark about Dominican doctors was close in time to the decision not to renew her employment contract,[5] was related to her, or was otherwise related to the employment decision. See Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 36 (1st Cir. 2001) (reasoning that although "'stray remarks' may be material to the pretext inquiry, 'their probativeness is circumscribed if they were made in a situation temporally remote from the date of the employment decision, or . . . were not related to the employment decision in question'" (quoting McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals, 140 F.3d 288, 301 (1st Cir. 1998))). Based on this evidence, no reasonable jury could conclude that Alvarado-Santos met her burden to show that the decision to not renew her contract

_____

[5] Alvarado-Santos received notice that her contract would not be renewed at the end of May 2004. Rodríguez-Pichardo's comment was described at trial as having been made some time "after October 1, 2003."

-15-

was motivated by national origin discrimination rather than by legitimate, nondiscriminatory reasons.

## B. Gender Discrimination

In support of her argument that her contract renewal was in fact motivated by gender bias rather than the legitimate reasons proffered by the Department of Health, Alvarado-Santos relied primarily on evidence that on several occasions prior to her contract nonrenewal, she was treated differently than Devarie. Alvarado-Santos offered evidence of the following disparities in treatment: (1) in the first few months after the transfer of health services from Rio Piedras, Admissions Center 705 did not yet have certain equipment that Devarie's Admission Center 308 had, such as an x-ray machine and land-line phone service; (2) after Alvarado-Santos altered the October 2003 shift schedule and several physicians complained, Rodríguez-Pichardo directed Guerrero to continue preparing the Admission Center 705 shift schedule rather than Alvarado-Santos, but permitted Devarie to continue preparing his own shift schedule for Admission Center 308; (3) after Alvarado-Santos complained that Guerrero was falsifying his time records, Rodríguez-Pichardo investigated, found her complaint unfounded, and directed Guerrero to submit his time records directly to human resources thereafter, but did not issue a similar order to any employees supervised by Devarie; and (4) Rodríguez-

Pichardo invited Devarie to attend a training in New York, but did not invite Alvarado-Santos.[6]

Alvarado-Santos characterizes these instances as "differential treatment based on gender." However, in each case, beyond the mere fact that Alvarado-Santos is a woman and Devarie is a man, there is no evidence that any difference in how she was treated was based on gender, and ample evidence of legitimate reasons for her differential treatment.

For example, her first point of discrimination relates to the differences in equipment between Center 705 and Center 308 in the first few months after the transfer of health services from Rio Piedras. Yet, there is no evidence that this difference had anything to do with her gender. Rather, the testimony showed that Center 308 was a pre-existing medical center, whereas Center 705 was a brand new facility created to receive the patients from the Rio Piedras facility that had to close. As such, it did not yet have all of its equipment.

Similarly, on Alvarado-Santos' second point, that Devarie was permitted to continue preparing his own shift schedule even

_____

[6] Alvarado-Santos also points to other ways in which she felt that Rodríguez-Pichardo undermined her supervisory authority. For example, Rodríguez-Pichardo ordered some personnel working in Admission Centers 308 and 705 to report to a centralized supervisor rather than to their Admissions Director, and he did not invite Alvarado-Santos to attend all monthly staff meetings. There was no evidence presented at trial, however, that Alvarado-Santos was treated any differently than Devarie in these respects.

after her scheduling duties were transferred to Guerrero, there was no evidence that this difference in treatment had anything to do with her gender. Rather, the testimony showed that Rodríguez-Pichardo gave Guerrero the responsibility after Alvarado-Santos altered the October 2003 shift schedule in a way that drew complaints from several doctors and that Rodríguez-Pichardo found unsuitable. There was no evidence that there had been any complaints about Devarie's assignment of shifts.[7]

For her third point of differential treatment, Alvarado-Santos says that Guerrero was told to submit his time records directly to Human Resources, rather than to Alvarado-Santos, whereas no such order was issued to any employees supervised by Devarie. Once again, there is no evidence that this change had anything to do with Alvarado-Santos' gender. Instead, it was explained by Rodríguez-Pichardo's determination that Alvarado-Santos had made an unsubstantiated claim that Guerrero was

---

[7] Alvarado-Santos also observes that in revising the October shift schedule she had prepared, Rodríguez-Pichardo removed shifts from two female physicians and left only one female on the schedule, and argues that this suggests gender bias. As set forth in more detail earlier in this opinion, Alvarado-Santos altered the original October shift schedule prepared by Guerrero, removing regular shifts from several physicians and awarding shifts to two female physicians who had not had any shifts on the original schedule. After receiving complaints from several physicians, Rodríguez-Pichardo revised the October shift schedule so that it again resembled the original schedule, returning shifts to the complaining physicians. This sequence of events, given its history and the few parties involved, does not support an inference of gender bias.

falsifying his time records.  There was no evidence of a similar unsubstantiated complaint being made by Devarie.[8]

In summary, the record contains abundant evidence that Alvarado-Santos and Devarie were not similarly situated and that the differential treatments cited by Alvarado-Santos were rationally based on differences between them.  As noted, Mena-Franco and Rodríguez-Pichardo testified that they decided not to renew Alvarado-Santos' contract because of the need to place the two Admissions Centers in Bayamón under the leadership of one Admissions Director in order to achieve greater uniformity and efficiency.  They further testified that they chose Devarie for this position over Alvarado-Santos based on their evaluation of the two Admission Centers and their review of monthly compliance reports, which indicated that Devarie's Admission Center had a significantly better compliance record than Alvarado-Santos' from October 2003 to May 2004.[9]  In addition, Devarie had five more

---

[8]  On her fourth point relating to the fact that Devarie went to a medical training program in New York while Alvarado-Santos did not, there is no explanation in the record for this distinction. Even unexplained, however, this single difference in treatment is far too insubstantial to support a claim of gender discrimination.

[9] Although she does not dispute that her Admissions Center had lower compliance levels than Devarie's, Alvarado-Santos argues that her supervisors' reliance on these monthly compliance reports in making their decision to terminate her was unfair because for the first few months of her time in Bayamón, her center (unlike Devarie's) lacked certain equipment such as an x-ray machine and land-line phone service.  At trial, however, Rodríguez-Pichardo offered unrebutted testimony that the compliance levels at Admissions Center 705 remained low even after the center was fully

-19-

years of experience as an Admissions Director than Alvarado-Santos. Alvarado-Santos offered no evidence to rebut the showing that Devarie's Admissions Center had consistently higher levels of compliance or that Devarie had more years of experience as an admissions director.

The evidence presented at trial was thus insufficient to allow a reasonable jury to conclude that Alvarado-Santos met her burden to show that her contract nonrenewal was motivated by gender discrimination rather than by legitimate, nondiscriminatory reasons.

## C. Comments During Closing Argument

The Department of Health also claims that it is entitled to a new trial based on the improper remarks of plaintiff's counsel during closing arguments. Because judgment is being entered for the Department of Health, there is no need to resolve that question. Nevertheless, if we had to reach the closing argument issue on the merits, the Department would have a good argument that it was entitled to a new trial. It may well be that the jury was influenced by the entirely improper and inflammatory closing argument by plaintiff's counsel, pitting people from Puerto Rico against people from the Dominican Republic.

Counsel made the following comments during closing argument:

equipped with an x-ray machine and phone service, in early 2004.

-20-

All these people care is about their cronies from the Dominican Republic.  They don't care about Puerto Ricans, except that they want to take their money.  That's all they care about.

They came to this service with one specific purpose:  It wasn't to take care of the inmates; it was to profit, and not let others, such as women, and non-Dominicans, to work with your money.

Later in closing, plaintiff's counsel stated:

Your verdict has to be sufficient to show these individuals that in Puerto Rico we do not discriminate.  . . . The number I submit to you should be herein no less than $2.5 million.  That is an amount that is gonna give them respect, it's gonna show them what ball game we are about. . . .

You have to send a message to Dr. Pichardo and his cronies that this doesn't happen in Puerto Rico. . . . What amount, if any, do you adequately say?  I submit to you that the number here is 2.5 million.  Nothing less will clear this event.

Ladies and gentlemen, don't let it happen in Puerto Rico.  You opened your arms to these people.  They came in.  You treated them fairly.  And what do they do? -- They stab you in the back.  They stabbed her in the back because she's a woman.  They stabbed her in the back because she's Puerto Rican.

That is not what Dr. Martin Luther King convinced a nation to do.

We are dismayed that, even while calling on the jury to uphold principles of equality and antidiscrimination, plaintiff's counsel made inflammatory arguments to the jury based on the Dominican nationality of some individual defendants.  Such arguments are "clearly prohibited conduct" and have no place in a

-21-

court of law.  <u>Smith</u> v. <u>Kmart Corp.</u>, 177 F.3d 19, 26 (1st Cir. 1999) (internal quotation marks and citation omitted).

## III.

For the foregoing reasons, we reverse the judgment of the district court and order the entry of judgment in favor of the Department of Health.  The parties shall bear their own costs on appeal.

<u>So ordered.</u>