Filed 8/20/24  Loyd v. Imperial County Narcotics Task Force CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| MICHAEL LOYD, | D081178 |
| Plaintiff and Appellant, | |
| v. | (Super Ct. No. ECU001391) |
| THE IMPERIAL COUNTY NARCOTICS TASK FORCE et al., | |
| Defendants and Respondents. | |

APPEAL from judgments of the Superior Court of Imperial County, L. Brooks Anderholt, Judge.  Affirmed.

Artiano Shinoff, Jack M. Sleeth, Jr., and Paul V. Carelli IV for Plaintiff and Appellant.

Robert J. Solis for Defendant and Respondent the Imperial County Narcotics Task Force.

Quarles & Brady and Jeff Michalowski for Defendant and Respondent the County of Imperial.

Fisher & Phillips, Aaron F. Olsen, Megan E. Walker, and Lauren Roseman for Defendant and Respondent Strategic Contracting Services, Inc.

Michael Loyd was terminated from his position as Commander of the Imperial Valley Narcotics Task Force (Task Force). He sued the Task Force, Imperial County (County), and Strategic Contracting Services (SCS; collectively, Defendants) for retaliation under the Fair Employment and Housing Act (FEHA; Gov. Code, § 12940, subd. (h)) and Labor Code section 1102.5, and for failure to prevent retaliation under FEHA (Gov. Code, § 12940, subd. (k)).[1]

Loyd alleged he was terminated for reporting that a male Task Force board member engaged in gender harassment of a female staff assistant, after the board member confronted her for declining to supply requested documents, and she and another female staff member avoided the board member. Defendants filed motions for summary judgment, which the trial court granted. The court ruled, inter alia, that Loyd could not establish he engaged in protected activity, because he lacked any reasonable belief that gender harassment occurred and did not report such conduct. The court entered judgments for Defendants.

On appeal, Loyd argues there are triable issues of fact on these and other matters. We reject his arguments regarding protected activity, do not reach the other matters, and affirm the judgments.

FACTUAL AND PROCEDURAL BACKGROUND

I.     *Background on the Task Force and Loyd's Position*

The Task Force operates pursuant to a Memorandum of Understanding between several public agencies, including the Imperial County District Attorney's (DA) Office and other County offices; police departments including

---

[1]     Statutory references are to FEHA unless specified. We generally refer to points made by at least one defendant as being by Defendants and distinguish between them as warranted.

2

El Centro, the California Highway Patrol (CHP), and federal agencies. The Task Force is intended to "ensure well-coordinated narcotic and gang enforcement regionally" and to "increase the flow" of information between the participating agencies.

The Task Force is governed by an Executive Board (Board), which consists of an official from each agency. One official is elected by the others as Chairman. During the relevant time, Imperial County DA Gilbert Otero was Chairman.

The Board also appoints a Commander, who manages the Task Force and reports to the Board through the Chairman. Loyd became Commander in 2001, while employed by the California Department of Justice. After he retired from that agency in June 2013, the Board wanted him to continue as Commander, and he did so. In September 2013, the County entered an "Employer of Record Service Agreement" with SCS on behalf of the Task Force, under which SCS would be Loyd's employer of record. The same month, Loyd entered an "Agreement to Provide Law Enforcement Services" with SCS and the County (through the County DA and Task Force Chairman).

II. *Underlying Events*

A. *The Board Renegotiates Loyd's Contract in 2018*

In 2018, the Board decided to renegotiate Loyd's contract, and proposed lowering his salary. Otero asked three Board members to conduct the negotiations: CHP Captain Arturo Proctor, City of Imperial Police Chief Leonard Barra, and Drug Enforcement Agent Frank Amavizca (Committee). Loyd met with the Committee, including in November 2018. Loyd later expressed concerns about the negotiations (see *post*). On December 3, Proctor sent Loyd an email with the Board's final offer, which included a $15,000

3

salary cut and work conditions (e.g., requiring him to work onsite, absent justification). On December 11, Loyd sent an email stating, "I accept the Board's offer and await finalization of the agreement from the [County]."

B. *Events in Late 2018 and Early 2019*

Meanwhile, on or around December 4, 2018, Proctor sent Irma Martinez an email request for Task Force documents. Martinez was an employee of the El Centro Police Department, who was assigned to work as a staff assistant for the Task Force. Otero emailed Martinez, asking her not to respond to Proctor and telling her that, if he followed up, to say he had "to contact [Otero] for such a request." Otero subsequently emailed the Board, stating the process to request documents was to "contact the department/agency head"; a "request was made to a staff member, . . . bypassing [the] Commander and/or the Chair"; and this was "unprofessional, defies common sense, and just plain wrong." He also stated, in part, that it was not "right or fair to put one of our clerical staff members in the middle of a situation that has been very contentious . . . ."

On December 6, 2018, Proctor went to the Task Force office and asked Martinez for the documents. According to Martinez, she told Proctor that he had to request the documents from Loyd or Otero; he asked her if she "felt uncomfortable in the situation," and she said yes; and he continued to request the documents. She said that when she declined, he became "visibly frustrated and irritated." Two male probation officers were present during the incident.

Loyd returned to the office shortly thereafter, and Martinez told him about the incident. Loyd recalled she had "tears in her eyes" and he had not "seen her so distraught" since he started working with her in 2005. He said she told him, "[Proctor's] in here, and he's beating on stuff and telling me I

4

gotta give him this, and I gotta do that, and yelling at me in front of the guys' . . . ." Loyd spoke with Proctor, Proctor said he had a right to the files, and Loyd stated, "No; no. You don't get to feel that way. Coming in here and talking to my staff assistant like that, what do you think you're doing? How dare you." After Proctor left, Loyd talked with Martinez again. He stated she said Proctor "kicked the chair, hit the table" and "scream[ed] at her in a very aggressive manner"; he told her it was "up to [her]" if she wanted to file a complaint; and she said, "I need to file a complaint. I can't tolerate that."

Martinez said she told Loyd that Proctor "became visibly frustrated and irritated that I was not giving him the documents . . . he requested." She denied telling Loyd that she felt Proctor "engaged in gender or sexual harassment, or took any action due to [her] gender." Loyd acknowledged in his deposition that Martinez did not say the incident related to gender or sex. Both Loyd and Martinez told Otero about the incident, and neither told him it had anything to do with gender or sex, either.

The following day, Martinez discussed the incident with her supervisor at the El Centro Police Department, Commander Aaron Reel, and told him she did not wish to take action. A few days later, Reel prepared a memorandum, which said Martinez "did not believe the interaction to be unprofessional or inappropriate," and she only described Proctor as "being visibly irritated at her responses to him to speak to Loyd or Otero" and felt she "was in an awkward/uncomfortable position . . . ."

According to Loyd, Martinez told him she filed a complaint against Proctor with the El Centro Police Department, but he did not specify its contents. Otero also recalled she filed a complaint, but he did not believe it had to do with gender or sex.

5

On February 8, 2019, Loyd sent Otero an email stating "FYI this is what I'm contemplating," with an attached document titled "Complaint." The document began, "Please consider this a formal complaint against [CHP] Captain Art Proctor," and focused on the contract negotiations. Loyd expressed concerns about Proctor's conduct and noted he told the Committee they "were trying to lowball [him] into quitting and looking to replace [him] with someone else" and "it was clear there w[ere] other agendas at play." In his deposition, he also said, in part, that he responded "[n]ot well" when told about the pay cut and "raise[d] [his] voice" when Proctor said something untrue.

Loyd's February 2019 complaint also briefly described the Martinez incident, stating in part that she was visibly upset, she said Proctor spoke to her in a "rude and demeaning manner," and she filed a complaint. It did not say the incident related to gender or sex.

Proctor was out of state until April 2019. On April 10, 2019, Martinez and another staff assistant, Yvette Tira, did not want to take notes at a Board meeting attended by Proctor, and Loyd did not make them. Loyd said Martinez "appeared very concerned" and did not want to be in the room with Proctor because of the "prior incident" and her feeling "very uncomfortable" near him; he could not recall if the "word she used" was "fearful or something like that . . . ." Loyd said Tira also did not want to attend due to Proctor, but he acknowledged he did not ask or find out why she did not want to be around Proctor.

After the Board meeting, Loyd met with Otero. Loyd said Otero "agreed . . . the hostile work situation could not continue and directed [him] to meet with [Proctor's] supervisor Kari Clark and advise her of the complaint." In his deposition, Otero testified Loyd wanted to go, and he said

6

to go.  Otero agreed he also wanted Loyd to tell Clark he (Otero) "tried to maintain the peace, but some people make it impossible" and "it's only going to get worse before it gets better," stating Proctor "makes it impossible to work with him."

Loyd met with Clark the next day, April 11, 2019.  On the first day of Loyd's deposition, he said he told Clark that Martinez had filed a complaint; she and Tira did not want to be in the room with Proctor; and Martinez had not heard back after three months.  He said that after Clark indicated she did not hear about the complaint, he stated, "Well, isn't that policy when somebody has got a sexual harassment complaint that it's moved up the flagpole, moved up the chain?"  Clark said, "Absolutely" and she would pull Proctor, meaning CHP, off the Task Force.  When asked what he told Clark about the substance of Martinez's complaint, he said, "[b]asically what had occurred . . . .  With the tantrum, I guess you would say, that [Proctor] had with Irma in the office."

On the second day of his deposition, Loyd denied using the word "sexual" when describing Martinez's complaint to Clark, or in connection with the incident prior to the lawsuit.  He was asked if he told Clark the incident "was because of [Martinez's] gender or her sex," and said, "No . . . I don't believe I said it like that," but "may have described it as, 'Hey, you have this about four-foot-ten female and this guy that is just going off on her, and that makes it incredibly wrong.' "  When asked if he and Clark discussed anything else, Loyd said Clark brought up his contract, calling it "bullshit" and asking if he could change it, and he said, "No . . . .  It's over."  Loyd later stated in his declaration that at the April 2019 meeting, he "advised [Clark] . . . of Proctor's gender . . . harassment."

Clark's recollection of the April 2019 meeting was that Loyd talked at length about his contract negotiations and that, towards the end, he brought up removing Proctor from the Task Force and mentioned the Martinez complaint. She met with her supervisor afterwards, and they agreed CHP would not withdraw from the Task Force. She also met with Proctor and told him what Loyd told her.

On May 6, 2019, Loyd sent Clark a text asking her to confirm CHP withdrew from the Task Force; she indicated they would be staying; and she said, in part, "I know you have issues with [Proctor] and he assured me they would be worked out."

C. *The Board Votes to Terminate Loyd in May 2019*

On May 8, 2019, the Task Force Board met in a closed session.[2] Proctor told them Loyd went to his chief (Clark) to discuss the contract negotiations and mentioned to her that there was an agenda. A different Board member similarly thought Loyd may have spoken to his mayor and city manager about these topics, and one (who seemed to be El Centro Police Chief Brian Johnson) said "go[ing] over our head" was "insubordination," and "unconscionable" unless there were facts showing something illegal, unethical, or immoral. Other concerns were raised, including that Loyd would not answer questions, was dismissive and disrespectful, "thumb[ed] [his] nose" at the Board, and had a "little bit of attitude." Johnson moved to terminate Loyd, Proctor seconded the motion, and six other members voted to terminate. Otero opposed the motion and voted no, another member voted no, and one member abstained.

---

[2] Otero recorded the meeting on his phone and a transcript is in the record; some speakers are not identified.

In his deposition, Loyd said that after the meeting, Otero told him the Board terminated him for insubordination, and when he asked why, Otero said it was because he let Clark know about Martinez's sexual harassment complaint. Otero did not recall this, but said he would assume Loyd was telling the truth.

The County subsequently notified SCS that it was terminating the Employer of Record Service Agreement.

III.   *Litigation*

Loyd filed suit against the Task Force, County, and SCS, plus other agencies who are no longer in the litigation. His operative first amended complaint included causes of action for (i) retaliation in violation of FEHA; (ii) failure to prevent retaliation under FEHA; and (iii) retaliation in violation of Labor Code section 1102.5.

Defendants moved for summary judgment. SCS argued, in part, that Loyd could not show a link between any adverse employment action by SCS and protected activity, essentially arguing it was not his employer. Both the County and Task Force similarly argued they did not subject him to an adverse employment action. They also argued Loyd did not engage in protected activity; there was "no causal link between the alleged protected activity (reporting gender harassment of [Martinez] to [Clark])" and his termination; and the termination was for legitimate, nonretaliatory reasons.

The trial court granted summary judgment for SCS on the grounds that Loyd could not show his termination by SCS was linked to protected activity and, rather, that it was based on termination of SCS's contract.

The trial court then granted summary judgment for the Task Force and County, based on a lack of protected activity (and, for the County, the lack of an adverse employment action).

9

First, the trial court ruled Loyd could not assert a reasonable belief that Proctor's conduct constituted gender-based harassment, as the "conduct in question consisted of [Proctor] yelling about a refusal to provide documents and hitting a table," and Loyd asserted only that the "participants were of opposite genders and . . . two women employees were reluctant to interact with the male captain." The court stated the "conduct here shows no connection to the respective genders of the participants," and a "dispute between two people of opposite genders" does not "automatically implicate gender-based harassment concerns."

Second, the trial court ruled Loyd could not show that reporting the conduct was a protected activity, "particularly as [he] [did] not dispute the fact that he never used the words gender or sex when making his report to Clark." The court explained his report "did not contain any indication that would put the employer on notice that he was reporting a suspected FEHA violation."

The trial court determined that because Loyd did not show he engaged in protected activity, he did not establish a prima facie case of retaliation under FEHA or the Labor Code, and it did not need to reach any remaining issues. The court entered judgments for Defendants, and Loyd appealed.

DISCUSSION

Loyd contends there are triable issues of fact as to whether he engaged in protected activity by disclosing to Clark what he reasonably believed to be gender harassment by Proctor. He further contends there are triable issues on causation, pretext, and whether Defendants are liable as joint employers. We conclude the undisputed facts show Loyd did not engage in protected activity, requiring affirmance of the judgments for all Defendants. We need not and do not reach the other issues.

10

I.     *Standard of Review*

"A trial court properly grants a motion for summary judgment where 'all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (Code Civ. Proc., § 437c, subd. (c).)" (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 286 (*Hartford*).) Thus, a defendant moving for summary judgment "bears the burden of persuasion that 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*); Code Civ. Proc., § 437c, subd. (p)(2).)

We " 'take the facts from the record that was before the trial court when it ruled on [the summary judgment] motion. [Citation.] " 'We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.' " [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.' " (*Hartford, supra*, 59 Cal.4th at p. 286.) The opposing party's evidence "remains subject to careful scrutiny." (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433 [evidence must " 'allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion' "].)

We "must affirm on any ground supported by the record." (*Jimenez v. County of Los Angeles* (2005) 130 Cal.App.4th 133, 140.)

11

II.     *Retaliation Under FEHA*

    A.     *Applicable Law*

Under FEHA, it is unlawful "for an employer 'to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part . . . .' " (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1035 (*Yanowitz*), quoting § 12940, subd. (h).)

We analyze Loyd's FEHA retaliation claims under the *McDonnell Douglas* test. Under this test, which was adopted from federal law as set forth in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, the plaintiff must first establish a prima facie case of retaliation. (*Yanowitz, supra,* 36 Cal.4th at p. 1042.) To do so "a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Ibid.*) "Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation ' " 'drops out of the picture,' " ' and the burden shifts back to the employee to prove intentional retaliation." (*Ibid.*)

An employer moving for summary judgment "has the initial burden to present admissible evidence showing either that one or more elements of plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory [or nonretaliatory] factors." (*Hicks v. KNTV Television, Inc.* (2008) 160 Cal.App.4th 994, 1003.) If the employer does so, it " ' "will be entitled to summary judgment unless the plaintiff produces admissible evidence which raises a triable issue of fact

material to the defendant's showing." ' " (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 344 (*Arteaga*), italics omitted.)

B.    *Analysis*

1.    *Whether Loyd Had a Reasonable Belief That Proctor Engaged in Gender Harassment*

Loyd contends he reasonably believed Martinez was "mistreated by Proctor because of her gender." This contention lacks merit.[3]

FEHA makes it unlawful "for an employer, 'because of . . . sex, . . . to harass an employee.' (§ 12940, subd. (j)(1).) Under the statutory scheme, ' "harassment" because of sex' includes sexual harassment and gender harassment. (§ 12940, subd. (j)(4)(C).)" (*Lyle v. Warner Brother Television Productions* (2006) 38 Cal.4th 264, 277 (*Lyle*).) The " ' "critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." ' " (*Id.* at pp. 279–280; cf. *id.* at p. 280 ["it is the disparate treatment of an employee on the basis of sex . . . that is the essence of a sexual harassment claim"].) Conduct supporting gender-based harassment may include "sex-specific and derogatory terms" and " 'evidence about how the alleged harasser treated members of both sexes . . . .' " (*Id.* at p. 281 & fn. 6.)

An "employee is protected against retaliation if the employee reasonably and in good faith believed that what he or she was opposing constituted unlawful employer conduct such as sexual harassment or sexual

_____

3    Although Loyd's complaint cited harassment and discrimination, his claims rest on one incident of alleged gender-based aggression and later avoidance of the aggressor. We thus focus on harassment. The dispositive issues (whether he reasonably believed unlawful gender-based conduct took place and disclosed such conduct) would be the same regardless.

discrimination." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 474; see *Yanowitz, supra*, 36 Cal.4th at p. 1043 [an "employee's conduct may constitute protected activity . . . , whether or not the challenged conduct is ultimately found to violate the FEHA"].)[4]

Viewing the record in the light most favorable to Loyd, we conclude he cannot show a reasonable belief that Proctor engaged in gender harassment.

First, with respect to the underlying events, Loyd did not witness the December 2018 incident, and the facts of both that incident and the April 2019 incident were objectively gender-neutral. In December, Proctor struck furniture and screamed at Martinez when she refused to supply documents he requested at Otero's direction. Martinez was very upset when she told Loyd what happened, but she did not tell him or Otero that the incident related to gender or sex. In April, Martinez and Tira did not want to take notes at a Board meeting attended by Proctor. Loyd testified only that Martinez said this was due to the prior incident and Proctor making her uncomfortable, and he did not ask or find out why Tira wanted to avoid Proctor.

The fact that Proctor is male, while Martinez and Tira are female, is insufficient to support a reasonable belief that Proctor's aggressive conduct was *because* of gender. (See *Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1118 ["The mere fact that [plaintiff's supervisor] is a

---

4    We need not resolve Loyd's disagreement with Defendants' view that "reasonable" means "objectively reasonable." (See *Dinslage v. City and County of San Francisco* (2016) 5 Cal.App.5th 368, 381–382 [citing federal law for proposition that the " 'belief must . . . be objectively reasonable' "].) As we explain shortly, Loyd failed to identify any facts that support an inference of gender-based harassment, so his belief was not reasonable by any standard.

female and plaintiff a male does not give rise to the inference that her alleged aggressive conduct was motivated by a desire to discriminate on the basis of gender"; it was "mere speculation" to infer conduct was based on gender]; *id.* at p. 1124 [none of the "trivial and occasional acts" at issue were "alleged to be sexual in nature and all . . . are objectively gender-neutral"]; *Aguilar, supra*, 25 Cal.4th at p. 864 ["Speculation . . . is not evidence."].)[5]

Loyd does not establish otherwise. In opposing summary judgment, he cited Martinez being "in tears" and her and Tira "avoiding contact" with Proctor as evidence of gender harassment. Being upset about offensive conduct, or trying to avoid it, does not imply one was subject to unlawful harassment. (*Arteaga, supra*, 163 Cal.App.4th at p. 344 [FEHA " 'is not a shield against harsh treatment' "]; see *Lyle, supra*, 38 Cal.4th at p. 295 [FEHA is " 'not a "civility code" ' "]; cf., e.g., *Kelley v. The Conco Companies* (2011) 196 Cal.App.4th 191, 207 ["[w]hile [plaintiff] was undoubtedly subjected to grossly offensive comments and conduct," he did not supply evidence that it was "because of his gender"], superseded by statute on other grounds as stated in *Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1239, fn. 2.) And, again, Loyd admitted he did not find out why Tira was avoiding Proctor.

Here, Loyd argues the "implication for [him]" of Martinez reporting that Proctor yelled at her "in front of the guys" was that he "demean[ed] [her]

---

5    See also, e.g., *Gregory v. Widnall* (9th Cir. 1998) 153 F.3d 1071, 1074–1075 ("mere fact that plaintiff is male and most of his supervisors are female" was "not sufficient to raise a jury question" for hostile work environment claim under title VII); *Alvarado-Santos v. Dept. of Health* (1st Cir. 2010) 619 F.3d 126, 134 ("beyond the mere fact that [plaintiff] is a woman and [the supervisor] is a man," there was "no evidence that any difference in how she was treated was based on gender").

because she was female . . . ." He also asserts "Martinez is small," "Proctor is much larger," and he "believed the physical difference was part of the intimidation factor." The presence of coworkers and a size difference are neutral facts. Even if they "impli[ed] for Loyd" that Proctor was motivated by gender, the implication is unreasonable without more.

Loyd further argues he believed Martinez made a sexual harassment complaint, as evidenced by him "specif[ying] to Clark . . . that [she] had complained of 'sexual harassment.'" This mischaracterizes the record (see discussion *post*) and either way, would show only that his belief was in good faith, not reasonable.[6] The other evidence Loyd cites here (his February 2019 complaint about Proctor, and deposition testimony) reflects only that Martinez said she made a complaint, not that it was about gender.

Second, the contemporaneous documentary evidence does not reflect any link between Proctor's conduct and gender. The December 2018 emails support a gender-neutral explanation for why he confronted Martinez: Proctor and Otero were in the midst of a document access dispute, and she refused to give Proctor documents at Otero's direction. Reel's December 2018 memorandum said Martinez described Proctor as "visibly irritated," not inappropriate, and did not address gender or sex or any facts relating to them. And Loyd's February 2019 complaint about Proctor described the Martinez incident only briefly, and did not mention gender or sex either.

Loyd argues the absence of these words in the February 2019 complaint does "not mean that he didn't have a reasonable and good faith belief that

---

6    For a similar reason, we reject Loyd's reliance on his deposition testimony that Otero said he was being terminated for reporting sexual harassment (which Otero did not recall) and that he responded by saying, "It's not insubordination to report sexual harassment." Assuming the statements were made, they could support good faith belief at most.

Martinez was mistreated due to her gender." But there would be no reason for him *not* to mention gender-based treatment by Proctor, if he thought it happened. Indeed, he mentioned sexual harassment by a different CHP officer, elsewhere in the complaint (noting that in 2017, "a CHP officer whom [Proctor] said he had handpicked" for the Task Force "was removed for sexual harassment").

Third, Loyd's February 2019 complaint expressed concern about Proctor's conduct generally, including toward Loyd, further undermining any inference of gender-based harassment. (Cf. *Lyle, supra*, 38 Cal.4th at p. 281 & fn. 6.) In the complaint, Loyd focused on his contract negotiations, and he accused Proctor of, among other things, "falsely accusing [Loyd] of lying to him" (which was "very unprofessional and unbecoming") and "defam[ing] [Loyd's] integrity to the [Board]." Even in describing the Martinez incident, Loyd's complaint said he told Proctor it "was inappropriate to demand . . . [Loyd's] staff assistant to do anything," and he later testified at deposition that it was "disrespectful to [Loyd]" for Proctor to confront Martinez. Otero similarly had concerns about Proctor's workplace conduct, including stating in his December 2018 email to the Board that Proctor's request to Martinez was "unprofessional" and in deposition that Proctor was "impossible" to work with.

Loyd's February 2019 complaint had also accused Proctor of "slamm[ing] a sheet of paper on the table" in front of him. Loyd argues that "arguably the single [paper] slam . . . would have been a lot worse . . . had Martinez been sitting in front of Proctor," because her "description . . . of Proctor's behavior was worse than the single slam Loyd witnessed." But Loyd does not deny Proctor acted aggressively toward him; he just speculates Proctor would have been more aggressive toward Martinez. (See *Crouse v.*

17

*Brobeck, Phleger & Harrison* (1998) 67 Cal.App.4th 1509, 1524 [a "party cannot avoid summary judgment based on mere speculation"].)

      2.     *Whether Loyd Disclosed Gender Harassment*

Loyd further argues he engaged in protected activity by disclosing what he believed to be gender harassment to Clark. We reject this argument too.

An "employee's unarticulated belief that an employer is engaging in discrimination [or harassment] will not suffice to establish protected conduct for the purposes of establishing a prima facie case of retaliation, where there is no evidence the employer knew that the employee's opposition was based upon a reasonable belief that the employer was engaging in discrimination [or harassment]." (*Yanowitz, supra*, 36 Cal.4th at p. 1046.) "[C]omplaints about personal grievances or vague or conclusory remarks that fail to put an employer on notice as to what conduct it should investigate will not suffice to establish protected conduct." (*Id.* at p. 1047.) "Nonetheless . . . 'an employee is not required to use legal terms or buzzwords . . . .' " (*Ibid.*) The " 'relevant question' " is " 'whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory [or harassing] manner.' " (*Ibid.*)

Although Loyd and Clark recalled certain details of their April 2019 meeting differently, the key facts are undisputed and foreclose any finding that Loyd sufficiently notified Clark that he believed Proctor engaged in gender harassment.

Loyd's deposition testimony reflected, at most, that he told Clark Proctor had a "tantrum" toward Martinez in December 2018, and she filed a complaint; that it was "incredibly wrong" for a guy to go off on a "four-foot-ten female"; and that she and Tira did not want to be in a meeting with Proctor.

18

He did testify he posed a question about the policy for a sexual harassment complaint.[7]  But he also denied using the term "sexual" to describe Martinez's complaint (or the incident, prior to the lawsuit), and when asked if he told Clark the incident "was because of . . . gender or sex," he said, "No." He did also state in his declaration that he "advised [Clark] of . . . Proctor's gender . . . harassment," but he could not "create a triable issue of fact by providing a declaration that contradicts [his] prior deposition testimony." (*Best Rest Motel, Inc. v. Sequoia Ins. Co.* (2023) 88 Cal.App.5th 696, 708–709.)

Further, both Loyd and Clark recalled discussing his contract at the April 2019 meeting (with him stating she said it was "bullshit"), as well as removal of Proctor from the Task Force.  And, in Clark's later text message advising Loyd that Proctor would be staying, she noted his "issues with" Proctor.

We conclude Loyd's statements to Clark constituted "complaints about personal grievances or vague or conclusory remarks" that did not suffice to alert her Loyd thought Proctor engaged in gender harassment.  (*Yanowitz, supra*, 36 Cal.4th at p. 1047; see *Foster v. Humane Soc'y of Rochester & Monroe County, Inc.* (W.D.N.Y. 2010) 724 F. Supp. 2d 382, 395 (*Foster*) ["none of what plaintiff complained about had anything to do with unlawful discrimination"].)  Loyd did not tell Clark that Proctor harassed Martinez because of gender (much less Tira) and did not disclose any facts reflecting gender-based harassment, such as gender-based language or differential treatment based on gender.  (Cf. *Lyle, supra*, 38 Cal.4th at p. 281, fn. 6.)

Loyd does not establish otherwise.

---

[7]     As described above, after Clark said she did not hear about Martinez's complaint, he said, "Well, isn't that policy when somebody has got a sexual harassment complaint that it's moved up the flagpole . . . ?"

First, he seeks to rely on his inquiry about sexual harassment policy. Assuming he made the remark, this hypothetical use of the term "sexual harassment" was insufficient to alert Clark that Loyd believed Proctor actually subjected Martinez to gender-based harassment. This insufficiency is underscored by the fact that, in opposing summary judgment, Loyd disclaimed his reliance on sexual conduct, stating the "issue is gender, not 'sexual' . . . ." (See *Kodl v. Bd. of Educ. et al.* (7th Cir. 2007) 490 F.3d 558, 563 ["Merely complaining in general terms of . . . harassment . . . is insufficient."]; *Foster, supra*, 724 F. Supp. 2d at p. 395 ["[T]he mere fact that plaintiff used the term 'hostile environment' in her email to her supervisor is not enough; the court must look at the substance of her complaint, not the terminology that she used."].)[8]

Second, Loyd contends the "entire reason" he went to Clark was because "Martinez complained to [him] on April 10, 2019 that [she] was fearful of Proctor, and did not want to be in the same room" as him. It is not clear if he makes this point in support of reasonable belief, disclosure, or both, but it lacks merit regardless. As noted, Loyd did not remember if Martinez used the word "fearful," and did not find out why Tira was avoiding Proctor. Even if his stated motive were genuine, it establishes neither that

---

[8]     Loyd argues that, in ruling it was undisputed he did not use the words gender or sex with Clark, the trial court overlooked this "sexual harassment" testimony. But he conceded at deposition he did not say the incident related to gender or sex, and he stated the fact of the "words . . . used" was undisputed in responding to the statements of undisputed facts from the County and Task Force. He suggests that stating the fact was undisputed was partly in error, due to Defendants not citing the "sexual harassment" testimony in their statements. This testimony does not change his concession, or itself create a triable issue as to disclosure, as discussed herein.

his belief in gender harassment was reasonable, nor anything about the content of his meeting with Clark.

Third, Loyd argues in connection with pretext that Defendants claimed he "spoke to Clark about his contract negotiation," but this "theory makes no sense" because he agreed to the contract in December 2018. But the contract was not final; his acceptance email said he "await[s] finalization of the agreement," and Otero testified it was not finalized. Even if it were final, that would not preclude discussion about it. Indeed, there is no dispute that he and Clark discussed his contract; they just differ as to who brought it up and what was said.

Finally, Loyd seeks to distinguish two cases cited by Defendants, *Carter v. Escondido Union High School District* (2007) 148 Cal.App.4th 922 (*Carter*) and *Patten v. Grant Joint Union High School District* (2005) 134 Cal.App.4th 1378 (*Patten*), disapproved on other grounds by *Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal.5th 703, 718, fn. 2 (*Lawson*). He contends they are not FEHA cases and are factually distinguishable, insofar as the *Carter* plaintiff did not take prompt action and the *Patten* plaintiff had both nonprotected and protected disclosures.

Neither contention has merit. Both cases involved Labor Code section 1102.5, which also requires protected activity and under which Loyd also brought a claim. (*Carter, supra*, 148 Cal.App.4th at pp. 925, 933 [public policy wrongful termination claim based in part on Lab. Code, § 1102.5]; *Patten, supra*, 134 Cal.App.4th at p. 1381 [Lab. Code, § 1102.5 claim].) And factual differences aside, they underscore that a report like Loyd's, which involves "at its core, a disagreement between [coworkers]," is not protected activity. (*Carter*, at p. 934; *id.* at pp. 933–934 [teacher's disclosure that coach recommended protein shake to student was not protected, where, inter alia,

21

"record [was] devoid of anything" to show belief in unlawful conduct was reasonable; this "was not whistleblowing . . . , but rather a routine 'internal personnel disclosure' "]; *Patten*, at pp. 1382, 1384–1386 [principal's complaints about a male gym teacher looking into the girl's locker room, and off-color remark by a male science teacher to a female student, involved personnel matters and did not support protected activity; disclosures regarding program expenditures did present a triable issue].)[9]

We conclude Loyd cannot establish he engaged in protected activity and thus cannot establish a FEHA retaliation claim. We affirm the judgments as to this cause of action.

III.  *Failure to Prevent Under FEHA*

Loyd acknowledges his FEHA "failure to prevent" claim under Government Code section 12940, subdivision (k) is derivative of his FEHA retaliation claim, and the judgments are affirmed for this claim as well. (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1021 [accepting concession that Gov. Code, § 12940, subd. (k) " 'cause of action [could] survive only if a "[r]etaliation" cause of action survives' "]; see *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 289 [employers "should not be held liable . . . for failure to take necessary steps" to prevent conduct violating FEHA, "except where the actions took place and were not prevented"].)

---

9    In his reply brief, Loyd contends he also engaged in protected activity by confronting Proctor. We "generally do not consider arguments raised for the first time in a reply brief" (*Raceway Ford Cases* (2016) 2 Cal.5th 161, 178), and it lacks merit anyway. Loyd argues that "although he didn't use the word woman or female with Proctor, that's what was in his head." An "unarticulated belief" is insufficient to establish protected activity. (*Yanowitz, supra*, 36 Cal.4th at p. 1046.)

IV.    *Retaliation Under Labor Code Section 1102.5*

Loyd argues that, like his FEHA retaliation claim, there are triable issues for his Labor Code section 1102.5 claim as to protected activity, based on both reasonable belief and disclosure.  We rejected these arguments above, and they fail here for similar reasons.

A.    *Applicable Law*

Labor Code section 1102.5, subdivision (b) provides in pertinent part that an employer "shall not retaliate against an employee for disclosing information" to an employee with authority to investigate it, if the employee has "reasonable cause to believe that the information discloses a violation" of a law, rule, or regulation.

For retaliation claims under this section, Labor Code section 1102.6 "provides the governing framework."  (*Lawson, supra*, 12 Cal.5th at p. 718.)  A plaintiff must show "by a preponderance of the evidence, that retaliation for an employee's protected activities was a contributing factor in a contested employment action."  (*Ibid.*)  The burden then "shifts to the employer to demonstrate, by clear and convincing evidence, that it would have taken the action in question for legitimate, independent reasons even had the plaintiff not engaged in protected activity."  (*Ibid.*)

B.    *Analysis*

Loyd's argument here consists mainly of a description of the legal standards for a Labor Code section 1102.5 retaliation claim.  We briefly address two points, to explain why his argument does not support a different result here than under FEHA.

First, Loyd asserts that under Labor Code section 1102.5, the question is whether he "reasonably believed he was disclosing a violation" of law, and this is a "fact-intensive inquiry."  But Loyd relies on a FEHA violation as the

23

basis for his Labor Code section 1102.5 claim, and we have concluded he did not establish a reasonable belief that FEHA was violated. He identifies no facts that warrant a different analysis of this issue under Labor Code section 1102.5.

Second, Loyd asserts that although a disclosure identifying a statute can support reasonable belief, such identification is unnecessary. There is no dispute Loyd did not have to cite FEHA when he talked to Clark. Rather, our conclusion that he did not disclose gender harassment to Clark was based on his failure to alert her to gender harassment *at all*, through either specific allegations or facts.

As with Loyd's FEHA retaliation claim, his failure to establish protected activity means he cannot establish a Labor Code section 1102.5 claim, and we affirm the judgments on this basis as well.

DISPOSITION

The judgments are affirmed. Defendants shall recover their costs on appeal.


O'ROURKE, Acting P. J.

WE CONCUR:


BUCHANAN, J.


RUBIN, J.

24