# United States Court of Appeals
## For the First Circuit

No. 24-1411

DAVID BONIFACE; NISSANDÈRE MARTYR; JUDERS YSEMÉ,

Plaintiffs, Appellees,

v.

JEAN MOROSE VILIENA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]

Before

Montecalvo, Circuit Judge,
Breyer,[*] Associate Justice,
and Lynch, Circuit Judge.

Peter Justin Haley, with whom Nelson Mullins Riley & Scarborough LLP was on brief, for appellant.

Diana Li Kim, with whom Bonnie Lau, Brian R. Matsui, Morrison & Foerster LLP, Daniel McLaughlin, Carmen K. Cheung, Center for Justice & Accountability, Philip A. O'Connell, Jr., and Dentons US LLP were on brief, for appellees.

William R. Stein, Shayda Vance, and Hughes Hubbard & Reed LLP on brief for Ambassadors Stephen J. Rapp and David J. Scheffer, amici curiae in support of appellees.

---

[*] Hon. Stephen G. Breyer, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

Aram A. Gavoor and Administrative Law, Issues & Appeals Clinic, George Washington University Law School, on brief for Professors of International Law, amici curiae in support of appellees.

_____

July 21, 2025

_____

**MONTECALVO, <u>Circuit Judge</u>.** This appeal stems from events that took place in Haiti in 2007-08. In March of 2023, a jury in the U.S. District Court for the District of Massachusetts found Jean Morose Viliena liable to plaintiffs David Boniface, Nissandère Martyr, and Juders Ysemé for several claims under the Torture Victim Protection Act ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (1992), 28 U.S.C. § 1350 (codified at note), a U.S. law that provides causes of action for torture or extrajudicial killings committed abroad under the color of foreign law. The jury found Viliena liable for the extrajudicial killing of Boniface's brother, Eclesiaste Boniface; the attempted extrajudicial killings of Ysemé and of Nissandère Martyr's father, Nissage Martyr ("Martyr"); and the torture of Ysemé and of Martyr. The jury awarded compensatory and punitive damages.

Viliena now brings a variety of challenges to the judgment and the damages awards. He contends that all of the findings of liability should be vacated, either because federal courts lack subject-matter jurisdiction or because Congress could not and did not authorize causes of action under the TVPA where the conduct occurred abroad between foreign nationals; in other words, that Congress lacked what he generally has labeled "legislative" jurisdiction. He also argues that at least the attempted extrajudicial killing findings of liability should be vacated because the TVPA, by its terms, does not provide for

- 3 -

attempt liability. In addition, he brings a variety of specific challenges to the trial and the damages awards, including the availability of secondary liability under the TVPA, the sufficiency of the evidence as to specific elements, the admission of an expert's testimony, and the granting of punitive damages.

For the reasons that follow, we conclude that we have subject-matter jurisdiction. We vacate, in part, the denial of the motion for reconsideration and remand for the district court to address Viliena's argument that Congress does not have the power to provide any cause of action under the TVPA here, where the conduct at issue occurred outside of the United States and between foreign citizens. In addition, given the impact the available causes of action will have on this analysis, we address -- and ultimately agree with -- Viliena's contention that the TVPA does not provide a cause of action for attempted extrajudicial killing. And, further, in the event the district court allows the extrajudicial killing and torture claims to proceed after addressing legislative jurisdiction, we address the remaining challenges to the trial rulings, the jury's findings of liability on those claims, and the damages awards.

## I. Factual Background

Because Viliena challenges the sufficiency of the evidence, we state the relevant facts in the light most favorable to the jury verdict. Alvarado-Santos v. Dep't of Health of P.R.,

619 F.3d 126, 127 (1st Cir. 2010) (citing <u>Visible Sys. Corp.</u> v. <u>Unisys Corp.</u>, 551 F.3d 65, 69 (1st Cir. 2008)).

Plaintiffs' claims arise out of two events that took place in a town called Les Irois in Haiti: the killing of Eclesiaste Boniface in July 2007 and a violent attack on the local radio station in April 2008.

Viliena took office as the mayor of Les Irois shortly before these events, in June 2007. Viliena's responsibilities as mayor included administering and managing the town of Les Irois. Viliena ran for mayor as a member of the MODEREH political party. A community-based armed group called KOREGA provided "muscle" to support Viliena as mayor, and Viliena and KOREGA used violence to suppress political opposition in each of the two incidents in which plaintiffs were harmed. Viliena was often seen around town with other community members affiliated with KOREGA, including Villeme Duclona and Hautefort Bajon, both of whom we will discuss in more detail later.

## A. July 2007 Killing of Eclesiaste Boniface

On July 27, 2007, a resident of Les Irois named Ostanie Mersier got into a dispute with the town's sanitation department over the placement of her garbage in front of her house. The sanitation department refused to collect Mersier's personal garbage while cleaning the street. When Mersier refused to collect her trash, the sanitation department summoned Mayor Viliena.

Viliena argued with her and then slapped her in the face. Viliena then arrested Mersier and brought her to the house of Judge St. Jean Bell to resolve the dispute.

A crowd of people followed, including plaintiff David Boniface, who was trained as a human rights advocate. Viliena asked the judge to make Boniface leave, saying that the issue "ha[d] nothing to do with" human rights. Boniface responded that everyone has rights. Hautefort Bajon, whom Viliena had hired as Director of City Hall, reprimanded Boniface for speaking harshly and Viliena stormed out. Outside of the judge's house, Viliena told Boniface, "Later on I'm coming for you."

After Viliena left, Judge Bell told Boniface to go home because his life had just been threatened. As Boniface was leaving, Viliena returned, accompanied by more people. One member of the group began "swinging at" Boniface. Bajon came out of the judge's house to join Viliena. Boniface felt "very threatened" and tried to distance himself from Viliena and his associates by walking backwards away from them. A pastor pulled Boniface into a church for safety. Community members soon came to accompany Boniface so that he could walk home, but Viliena and his supporters followed. Someone with Viliena threw a bicycle at Boniface, which a community member intercepted. Bajon then looked at Viliena and said, "leave him alone, we'll deal with him later." Viliena nodded, and he and his associates left.

Later that day, Boniface and his mother went to church while his younger brother Eclesiaste stayed home. Viliena and about twenty of his supporters, armed with guns, machetes, and clubs, went to Boniface's home. Viliena and Bajon were each holding a gun. When someone in the mob called for Boniface, Eclesiaste responded that his brother was not home. Another member of the crowd told Eclesiaste to come outside to get something for Boniface. When Eclesiaste came out, Viliena shot him.[1] One of Viliena's supporters then picked up a cinderblock and dropped it on Eclesiaste's head. The mob left Eclesiaste's body in the street.

Viliena's group then surrounded the church where Boniface and his mother were worshipping, preventing them from leaving. Boniface and his mother sheltered at the pastor's home overnight in fear for their lives. The next morning, Boniface went to Judge Bell's house to ask him to start an investigation into his brother's killing and brought the judge to his brother's body. Boniface and a crowd of neighbors carried Eclesiaste's body to Viliena's office at City Hall to demand that Viliena bury the

---

[1] Another witness testified that Bajon shot Eclesiaste after Viliena said, "As we don't find David [Boniface], let's shoot Eclesiaste, like, in his place." Because we take the facts in the light most favorable to the jury verdict, Alvarado-Santos v. Dep't of Health of P.R., 619 F.3d 126, 127 (1st Cir. 2010), we assume that the jury credited the testimony that Viliena himself shot Eclesiaste.

body in accordance with a local tradition that killers bury their victims. Viliena refused and called police officers, who hit Boniface and the others with the back of their shotguns and ordered everyone to leave. Boniface and his family buried Eclesiaste themselves.

Boniface was forced to leave Les Irois in 2017, after Viliena's father publicly threatened to kill him. Since then, Boniface has been living in hiding, separated from his wife and children.

## B. April 2008 Radio Station Attack

The remaining claims arise from an attack on the radio station in Les Irois. Les Irois had one radio station, called "New Vision," which witnesses described as a source of pride for the community. The radio station was located at Nissage Martyr's house, and plaintiff Juders Ysemé spent his free time there.

The radio station was founded by Orelien Joaquim, a member of a political party called the Struggling People's Party, which opposed MODEREH. While Joaquim was running for town deputy, he promised to establish a radio station in Les Irois. After being elected, Joaquim fulfilled that campaign promise by establishing New Vision. Some of the political discussions on the radio were critical of Viliena as mayor. Viliena opposed the radio station and first asked the civil protection agency, which reported to him as the mayor, to take charge of the station. The civil protection

agency refused. Viliena told the civil protection agency, "I will do this myself."

Soon after, Joaquim invited Viliena to call in to the radio station. On the air, Viliena yelled at Joaquim, vowing to shut down the station and destroy it.

On April 8, 2008, Viliena and a crowd of people attacked the radio station. Around noon, witnesses saw Viliena and another man head out of town on a motorcycle. The two men returned about an hour and a half later with a backpack and a long duffel bag. They pulled up to the radio station, where a group of about twenty to thirty of Viliena's supporters were waiting. Viliena reached into the backpack and pulled out guns, which he passed out to the crowd. He pulled out a shotgun from the long duffel bag and gave it to Villeme Duclona. Other members of the mob were armed with machetes, ice picks, and clubs. Viliena himself had a gun. After Viliena handed out the weapons, Duclona shot the shotgun in the air and the crowd headed towards the radio station. Viliena told them to "attack" the station and led the way.

Ysemé was at the radio station with Martyr's family, and he ran to hide in the back of the house. Viliena and his mob broke down the front door. From where he was hiding, Ysemé heard Viliena discover Martyr and accuse him of hiding to report on Viliena destroying the radio station. Ysemé heard Martyr screaming that Viliena was beating him and saying, "you busted my head with your

- 9 -

gun."  Ysemé testified that over a minute elapsed while Viliena was beating Martyr.

Viliena then discovered Ysemé hiding in the back of the house.  Viliena grabbed Ysemé by the collar and started beating him too, hitting him all over his face and body.  Viliena also accused Ysemé of hiding in order to be able to report who destroyed the radio station.  Viliena threatened to put a noose around Ysemé's neck and hang him in the public plaza.  Ysemé felt like "all of [his] bones were cracking" from the pain of Viliena's blows.

Meanwhile, Villeme Duclona and Viliena's other supporters were vandalizing and removing the radio equipment from the station.  Viliena dragged Ysemé onto the porch and ordered an associate to restrain Ysemé until they could hang him.  When the associate momentarily let go of Ysemé in order to pillage more radio equipment, Ysemé ran.  He heard Viliena say, "Villeme [Duclona], shoot him.  Shoot Juders [Ysemé]."  Duclona obeyed.  Shotgun pellets sprayed the side of Ysemé's body, hitting his eye, head, arm, and stomach.

Viliena also told Duclona to shoot Martyr.  When Duclona hesitated, Viliena insisted.  Duclona then shot Martyr in the leg.  Martyr was in "excruciating pain" and thought he was dying.

Ysemé and Martyr both survived but suffered permanent injuries.  Ysemé lost one eye.  He was hospitalized for

- 10 -

twenty-three days and underwent many surgeries, but the doctors were not able to remove all of the shotgun pellets from his face and body. He testified that he still feels pain "like [his] skin is tearing apart" from the pellets that remain in his body and that he has "a continuing excruciating headache, nonstop." He left Les Irois in 2017 out of fear that Viliena might kill him and has lived in hiding, separated from his wife and family, ever since.

Martyr's leg was amputated, and he spent four months in the hospital. He was unable to continue working as a farmer or to provide for his family. He felt that he was living "as an animal," not "with the dignity of a human being." Martyr died suddenly in 2017, two days after this lawsuit was filed.[2]

### C. Viliena's Move to the United States

Viliena obtained lawful permanent resident status in the United States in July 2008. He moved to the United States permanently in 2009, although he continued to travel to and from Haiti periodically. At the time of trial, he lived in Malden, Massachusetts, and worked as a truck driver.

---

[2] Ysemé testified that Martyr felt well at the beginning of the day but, over the course of a few hours, began to sweat profusely and was unable to speak or talk. He died in the ambulance on the way to a larger hospital.

## II. Procedural History

The plaintiffs initially sought relief through both criminal and civil proceedings in local Haitian courts. The parties have different accounts as to what happened in the criminal proceedings, but they agree that Viliena was never convicted. Similarly, the parties agree that the plaintiffs never received civil damages but disagree on the reasons. The plaintiffs state that they were awarded monetary damages in civil lawsuits in Haiti but never recovered any part of the awards. Viliena says that those claims were dismissed.

In 2017, Boniface, Martyr, and Ysemé filed this lawsuit in the U.S. District Court for the District of Massachusetts, seeking damages for acts allegedly committed by Viliena in Haiti between 2007 and 2010.[3] The plaintiffs brought claims under the TVPA, which are the claims at the heart of this appeal; under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350; and for arson under Haitian law.[4] Specifically, the plaintiffs alleged that the extrajudicial killing of Eclesiaste Boniface, the attempted extrajudicial killings of Martyr and Ysemé, and the torture of Martyr and Ysemé violated the TVPA.

---

[3] After Martyr's death, his son, Nissandère Martyr, was substituted as a plaintiff.

[4] The arson claim proceeded to trial and the jury found Viliena not liable. We do not discuss any of the evidence related to the arson claim because it is not relevant to the issues on appeal.

## A. Pretrial Motions

Given the extensive procedural history, we will only highlight the aspects that are relevant to the resolution of this appeal, providing more detail as needed in later sections.

First, in response to Viliena's motion, the district court dismissed the plaintiffs' ATS claim. The district court agreed with Viliena that under Kiobel v. Royal Dutch Petroleum Company, 569 U.S. 108 (2013), the complaint failed to allege with sufficient particularity that the claims touched and concerned the territory of the United States. The district court therefore determined that the ATS did not provide a cause of action for plaintiffs' claims. But the district court rejected Viliena's argument that Kiobel also required dismissal of the plaintiffs' TVPA claims. The district court reasoned that Kiobel did not concern the TVPA and that 28 U.S.C. § 1331 (the federal question jurisdiction statute) separately provided subject-matter jurisdiction for the TVPA claims.

Second, Viliena filed a motion for reconsideration of the district court's determination that it had subject-matter jurisdiction over the TVPA claims. He reiterated his argument that the claims did not "touch and concern" the United States, using Kiobel's language, but added that "the exercise of jurisdiction over domestic crimes within another country between persons who are not United States citizens falls outside the limits

of the authority vested in Congress by the Constitution" and was potentially "an unconstitutional exercise of legislative authority." But the district court affirmed that it had subject-matter jurisdiction over the TVPA claims, writing that it "underst[ood] Viliena's argument . . . to be another attempt at arguing for an extension of Kiobel's holding to the TVPA, which the [c]ourt ha[d] already rejected."

## B. Trial

At trial, the plaintiffs presented evidence supporting the three TVPA claims: the extrajudicial killing of Eclesiaste Boniface, the attempted extrajudicial killings of Martyr and Ysemé, and the torture of Martyr and Ysemé.

In addition to the allegations above, which were recounted through eyewitness testimony, the plaintiffs presented expert testimony from Robert Maguire, an academic with expertise on political violence in Haiti. Maguire testified about the conditions of political violence in Haiti and, in particular, community-based armed groups, describing these as groups that work in "a symbiotic relationship with a" politician and which "function above the arm of the law." In addition to giving general information about such organizations, he opined that KOREGA is a community-based armed group that aligns itself with political groups and provides political leaders with "muscle" to help them get elected and stay in power. Maguire also testified that KOREGA

- 14 -

was aligned with the MODEREH party in the late 2000s and that the Struggling People's Party was MODEREH's main opposition.

After the plaintiffs' case, Viliena moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). The district court took the motion under advisement, opting not to decide it until the jury had returned a verdict.

The defense's case consisted of Viliena's testimony, in which Viliena offered a different account of the events.[5]

## C. Jury Verdict

The jury found Viliena liable to the plaintiffs on each of the three TVPA claims, entering responses to claim-specific questions in a verdict form. The jury awarded actual damages of $1.75 million to Boniface for the extrajudicial killing of his brother. The jury found Viliena liable for both the attempted extrajudicial killing and the torture of Martyr. For these two separate liability findings, the jury gave a single damages award of $1.25 million to Martyr's son, Nissandère Martyr. The jury also found Viliena liable for both the attempted extrajudicial killing and the torture of Ysemé. The jury awarded Ysemé $1.5 million. The jury also awarded $11 million in punitive damages.

_____

[5] Due to Viliena's challenge to the sufficiency of the evidence, which requires us to view the facts in the light most favorable to the verdict, we do not detail Viliena's testimony that contradicted the plaintiffs' evidence.

- 15 -

## D. Post-Trial Motions

Following the jury verdict, Viliena renewed his motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and also moved for a new trial and remittitur under Federal Rule of Civil Procedure 59(a). The district court denied the motions.

Viliena timely appealed.

## III. Discussion

We first address Viliena's arguments about subject-matter jurisdiction and legislative jurisdiction. We then discuss the availability of a cause of action for attempted extrajudicial killing under the TVPA. We end by addressing Viliena's remaining challenges to the liability findings and the damages awards.

## A. Threshold Constitutional Questions

We begin, as we must, with Viliena's arguments that neither we nor the district court have the power to hear this case. Viliena has repeatedly argued that federal courts lack subject-matter jurisdiction over this case because "Congress [may not] make laws providing for the adjudication of foreign disputes between foreign citizens." Before going into the specifics of this case, we pause to clarify the questions that this argument presents, which have been the source of some confusion.

"Subject-matter jurisdiction" refers to a court's power to hear the case before it. Federal courts have limited subject-matter jurisdiction, meaning that they possess "only that power authorized by Constitution and statute." Gunn v. Minton, 568 U.S. 251, 256 (2013) (quoting Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994)). Because subject-matter jurisdiction "involves a court's power to hear a case, [it] can never be forfeited or waived." Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)). Courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." Id. (citing Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583 (1999)). To make this determination, we look to the Constitution and to a statute that authorizes the federal courts to exercise jurisdiction. See Gunn, 568 U.S. at 256. And, if a federal court concludes that subject-matter jurisdiction is lacking, it must dismiss the complaint, no matter what stage of the proceeding the case is in. Arbaugh, 546 U.S. at 514.

"Legislative jurisdiction" refers to a legislature's power to pass a statute. Torres v. Lynch, 578 U.S. 452, 454 (2016). In other words, it deals with "the authority of a state to make its law applicable to persons or activities." Hartford Fire Ins. Co. v. California, 509 U.S. 764, 813 (1993) (quoting 1

Restatement (Third) of Foreign Relations Law of the United States 231 (1987)) (Scalia, J., dissenting).  To determine whether Congress has exceeded its powers, we look to the Constitution and the powers that it grants to Congress.  See id.  However, even if Congress lacked constitutional power to pass a statute or provide a particular cause of action, the court would nonetheless have the power to decide whether Congress possessed that power.  See id. (legislative jurisdiction "is quite a separate matter from 'jurisdiction to adjudicate'" (citation omitted)).

As we will explain below, Viliena's arguments, which he has framed as challenging "subject-matter jurisdiction," actually contain two separate arguments: one challenging subject-matter jurisdiction (meaning federal courts' power to hear this case) and one challenging legislative jurisdiction (meaning Congress's power to authorize the TVPA to apply where the conduct occurred outside the United States and between foreign citizens).  We will therefore address each argument separately.

## 1. Subject-Matter Jurisdiction

Viliena first argues under Kiobel that federal courts do not have subject-matter jurisdiction over these TVPA claims, which concern alleged torts committed outside of the United States by and against non-U.S. citizens.  The district court's determination that it had subject-matter jurisdiction over the complaint presents a legal question that we review de novo.  Bower v.

Egyptair Airlines Co., 731 F.3d 85, 90 (1st Cir. 2013) (citing Fernández-Vargas v. Pfizer, 522 F.3d 55, 63 (1st Cir. 2008)). For the reasons that follow, we affirm the district court's conclusion that there is federal question jurisdiction over these TVPA claims.

We look to the Constitution and an authorizing statute. See Gunn, 568 U.S. at 256. The Constitution states, in relevant part, that "[t]he judicial Power shall extend to all Cases, in Law and Equity, arising under . . . the Laws of the United States." U.S. Const. art. III, § 2, cl. 1. Congress, in turn, has authorized federal district courts to exercise original jurisdiction in "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Supreme Court has counseled that "a case arises under federal law when federal law creates the cause of action asserted." Gunn, 568 U.S. at 257. Here, the TVPA provides an express federal cause of action, 28 U.S.C. § 1350 note § 2(a), so TVPA claims "arise[] under" federal law, § 1331. Federal courts therefore have federal question subject-matter jurisdiction over TVPA claims.

### 2. Legislative Jurisdiction

We now turn to Viliena's argument that Congress lacked the power to authorize civil liability under the TVPA for alleged acts of torture and extrajudicial killing occurring outside of the United States and between foreign citizens. We first explain his argument on appeal before turning to the procedural history in

detail to explain why this argument was sufficiently presented to the district court. We then explain the standard of review and conclude that we must remand for the district court to decide this issue in the first instance.

On appeal, Viliena argues that the TVPA does not fall within the constitutional grant of the Offenses Clause, which authorizes Congress to "define and punish . . . Offenses against the Law of Nations." U.S. Const. art. I, § 8, cl. 10. Viliena resists the idea that the Offenses Clause gives Congress the power to grant federal courts civil jurisdiction over actions occurring outside of the United States for conduct that does not touch or concern the United States. He also notes that, even if the TVPA can overcome the presumption against extraterritorial application, statutes should be construed to avoid violating the law of nations if possible. (Quoting Hartford Fire Ins. Co., 509 U.S. at 814-15 (Scalia, J., dissenting)). He goes so far as to argue that our exercise of extraterritorial jurisdiction would in fact violate "the law of nations" (i.e., customary international law) and "traditional notions of comity" that prevent one country from "sit[ting] in judgment on the acts of the government of another, done within its own territory." (Quoting Underhill v. Hernandez, 168 U.S. 250, 252 (1897)). Therefore, Viliena concludes, even if Congress intended the TVPA to apply extraterritorially, Congress

did not actually have the power to infringe on other countries' jurisdiction.

Viliena's briefing is admittedly muddy on this point. Even now, it is not clear that he understands his argument about legislative jurisdiction to be distinct from the issue of subject-matter jurisdiction. Indeed, all of the arguments just laid out are presented as part of his challenge to subject-matter jurisdiction. Viliena's briefing before the district court was similarly unclear, although, for the reasons that follow, we are persuaded that he raised this argument sufficiently so as to be preserved. To explain why, we walk through the procedural history in some detail.

First, in addressing subject-matter jurisdiction in his motion to dismiss, Viliena cited legislative history that identified the Offenses Clause as a source of Congressional power to pass the TVPA and argued that the law of nations did not allow for one sovereign to exercise jurisdiction over the affairs of another. (Citing S. Rep. 102-249, at 5 (1991)). He contended that Congress may not "make laws providing for the adjudication of foreign disputes between foreign citizens." The plaintiffs argued in response, in part, that the Offenses Clause provided Congress's constitutional power to apply the TVPA extraterritorially. In denying this part of the motion to dismiss, the district court held that 28 U.S.C. § 1331 granted jurisdiction over the TVPA

claims and rejected Viliena's arguments based on extraterritoriality, noting that Kiobel did not concern the TVPA. Boniface v. Viliena, 338 F. Supp. 3d 50, 63-64 (D. Mass. 2018). However, it did not address Viliena's argument that Congress itself did not have power to pass the TVPA; indeed, it is not clear that the district court discerned that this was a separate argument that had to be addressed. See id.

Next, in his motion for reconsideration, Viliena made the argument more clearly, explaining that his challenge to the district court's exercise of § 1331 jurisdiction could be "framed either as a question as to the constitutional bounds of the TVPA or the substantive meaning and interpretation of the statute itself"; in other words, the exercise of extraterritorial jurisdiction here "falls outside the limits of the authority vested in Congress by the Constitution and is either not encompassed by the statute itself or [is] an unconstitutional exercise of legislative authority."[6] (Emphases added). Viliena then developed his arguments related to the Offenses Clause, the law of nations, and the notion of comity, making the precise arguments that he now renews on appeal. In opposition, the plaintiffs argued that the Offenses Clause provided Congress with "the constitutional power

---

[6] Viliena separately filed a motion for certification of an interlocutory appeal, in which he largely repeated the Kiobel-based arguments from his motion to dismiss.

to give the TVPA extraterritorial reach"; in addition, the plaintiffs contended that the TVPA was enacted to implement the United States's international treaty obligations under the Convention Against Torture.

The district court denied the motion for reconsideration. Boniface v. Viliena, 417 F. Supp. 3d 113, 118 (D. Mass. 2019). The district court described the motion as raising two issues: "first, whether a court may exercise subject[-]matter jurisdiction over TVPA claims based on 28 U.S.C. § 1331, and second, whether the exercise of jurisdiction over TVPA claims pursuant to § 1331 is unconstitutional in some circumstances." Id. The district court reiterated that it had § 1331 jurisdiction over the TVPA claims. Id. at 118-19. To answer whether the exercise of extraterritorial jurisdiction here was "unconstitutional as violative of the law of nations," the district court compared the parties' competing arguments about the Offenses Clause before concluding: "The [c]ourt understands [Viliena]'s argument on this point to be another attempt at arguing for an extension of Kiobel's holding to the TVPA, which the [c]ourt has already rejected." Id. at 120. The district court also rejected Viliena's arguments grounded in international comity, noting that Congress's statutes may permissibly have extraterritorial reach and rejecting the idea that the TVPA violated the law of nations. Id. at 120-22. Because Viliena

- 23 -

provided no case law to support his position, the district court was not persuaded that its exercise of jurisdiction was unconstitutional.  Id. at 122.  But the district court granted Viliena's motion for certification of an interlocutory appeal on the scope of jurisdiction under the TVPA.  Id. at 124.  The First Circuit, however, denied Viliena's petition.  Viliena's arguments about legislative jurisdiction therefore remained unanswered as the case proceeded to trial.

We review the district court's denial of Viliena's motion for reconsideration for abuse of discretion.  United States v. Allen, 573 F.3d 42, 53 (1st Cir. 2009) (citing United States v. Fanfan, 558 F.3d 105, 106 (1st Cir. 2009)).  "Reconsideration may be proper . . . where the district court has misunderstood a party or made an error of apprehension."  Villanueva v. United States, 662 F.3d 124, 128 (1st Cir. 2011).

Because Viliena did not clearly delineate the two arguments about subject-matter jurisdiction and legislative jurisdiction, we understand the district court's misapprehension of the issues.  But this continued misapprehension constituted an abuse of discretion.  See id.  Viliena's arguments, especially as presented in his motion for reconsideration, were not merely "another attempt at arguing for an extension of Kiobel's holding to the TVPA."  Whether Congress had the power to apply the TVPA to conduct occurring abroad between foreign citizens is a critical

question, separate from subject-matter jurisdiction, that Viliena raised before the district court and that the district court has not yet decided. We therefore reverse the denial of the motion for reconsideration and remand.

We note that there are two distinct questions that the district court may have to consider on remand. First, as a matter of statutory interpretation, does the TVPA provide a cause of action for the facts here? Second, if the TVPA does provide such a cause of action, is that constitutional? In other words, did Congress have the power to authorize civil liability in this case, for acts committed by one foreign national upon another foreign national in a foreign country? While we are not aware of other courts that have grappled with these precise questions, we are confident that the district court can do so, aided by clearer briefing from the parties that squarely addresses this issue.[7]

---

[7] We note that the district court held, in dismissing plaintiffs' ATS claim, that the alleged facts did not "sufficiently 'touch and concern' the United States" and lacked "a sufficient connection to the United States." Boniface v. Viliena, 338 F. Supp. 3d 50, 63 (D. Mass. 2018) (quoting Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108, 124-25 (2013)). Plaintiffs did not appeal this holding or the dismissal of the ATS claim. As a result, it is the law of the case that the facts pled did not "sufficiently 'touch and concern' the United States" and lacked "a sufficient connection to the United States" for the purposes of the ATS. See AngioDynamics, Inc. v. Biolitec AG, 880 F.3d 596, 599 (1st Cir. 2018) ("[U]nless corrected by an appellate tribunal, a legal decision made at one stage of a civil or criminal case constitutes the law of the case throughout the pendency of the litigation." (alteration in original) (quoting Ellis v. United States, 313 F.3d 636, 646 (1st Cir. 2002))).

## B. Attempted Extrajudicial Killing Cause of Action

We turn to an additional issue that was thoroughly briefed and litigated before the district court: whether the TVPA provides a cause of action for <u>attempted</u> extrajudicial killing. We agree with Viliena that the TVPA provides no such cause of action; the parties' arguments and the district court's decision on legislative jurisdiction should accordingly be narrowed to consider only the TVPA's extrajudicial killing and torture causes of action.

The jury found Viliena liable for the attempted extrajudicial killings of Martyr and Ysemé during the radio station attack where Martyr and Ysemé were beaten and shot but not killed. Before the district court, Viliena moved to dismiss this claim, arguing that the plain language of the TVPA did not allow for an "attempted" extrajudicial killing. The district court disagreed because Viliena had offered no case law in support.

On appeal, Viliena argues that the TVPA, by its terms, does not provide a cause of action for attempted extrajudicial killing. (Citing <u>Appel</u> v. <u>Hayut</u>, No. 20 Civ. 6265, 2021 WL 2689059 (S.D.N.Y. June 30, 2021)). Therefore, Viliena argues, the district court erred in allowing these claims to proceed to trial.

Whether the TVPA provides a cause of action for attempted extrajudicial killing is an issue of statutory interpretation that we review de novo. <u>See</u> <u>Bos. & Me. Corp.</u> v. <u>Mass. Bay Transp.</u>

- 26 -

Auth., 587 F.3d 89, 98 (1st Cir. 2009). We look first to the plain text of the statute, Penobscot Nation v. Frey, 3 F.4th 484, 490 (1st Cir. 2021) (en banc), "determin[ing] whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case," id. (quoting Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002)). "When the text is unambiguous and the statutory scheme is coherent and consistent, we do not look to legislative history or Congressional intent." Id. at 491 (citing Carcieri v. Salazar, 555 U.S. 379, 392 (2009)).

In its section on liability, the TVPA provides:

An individual who, under actual or apparent authority, or color of law, of any foreign nation—
    (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or
    (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

28 U.S.C. § 1350 note § 2(a). The TVPA defines "extrajudicial killing" as "a deliberated killing not authorized by a [lawful court order]." Id. § 1350 note § 3(a).

Because the statute itself does not mention a cause of action for attempts, we examine the word "killing" to see if it might encompass an attempted killing. For the reasons that follow,

we are persuaded that it does not: "killing" necessarily means that a death resulted.

We begin by turning to the dictionary, as dictionaries may help us to determine the ordinary meaning of the word "killing." See Penobscot Nation, 3 F.4th at 491. "Killing" is "[t]he act of causing the end of an animate thing's life." Killing, Black's Law Dictionary (12th ed. 2024). Merriam-Webster confirms this ordinary meaning, defining "killing" to include "the act of one that kills," Killing, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/killing [https://perma.cc/435U-YJKT] (last visited June 23, 2025), and defining "kill" as "to deprive of life" or "cause the death of," Kill, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/kills [https://perma.cc/ECT7-86MJ] (last visited June 23, 2025). These definitions make clear that death is a necessary result of a killing.

This plain meaning is confirmed by the statutory scheme, which provides damages in the case of an extrajudicial killing to "the individual's legal representative, or to any person who may be a claimant in an action for wrongful death." 28 U.S.C. § 1350 note § 2(a)(2). This stands in stark contrast to the cause of action for torture, which provides damages to "that individual [who was tortured]." Id. § 1350 note § 2(a)(1). Therefore, if we read the TVPA to provide a cause of action for attempted

- 28 -

extrajudicial killing, the statute would appear to only allow the survivor's legal representative to recover damages -- not the actual survivor of the attempted extrajudicial killing. The oddness of this alternative interpretation confirms that the TVPA contemplates a cause of action only for completed, not attempted, extrajudicial killings.

Finally, we note that we are not alone in determining that the TVPA does not provide a cause of action for attempted extrajudicial killings. See Borochov v. Islamic Republic of Iran, 94 F.4th 1053, 1061 (D.C. Cir. 2024) ("The [TVPA] does not allow any tort claim for injuries arising from an attempted killing."); see also Appel, 2021 WL 2689059, at *9-10 (noting the court's doubts that a "plain reading" of the TVPA provided a cause of action for attempted extrajudicial killing, although it ultimately did not need to decide the issue); Mamani v. Sánchez Bustamante, 968 F.3d 1216, 1233 (11th Cir. 2020) (stating, in discussing whether a killing was sufficiently "deliberate," that the TVPA "requires, at a minimum, that there be a considered, purposeful act that takes another's life").

The plaintiffs do not base their argument for attempt liability on the statutory text itself. Instead, they urge us to look past the plain text of the statute, arguing that Congress based the TVPA's definitions on various international law sources that allow for attempt liability. In the face of such clear and

unambiguous statutory language, we are not persuaded to look beyond the bounds of the TVPA itself.[8]

Because the statutory language demonstrates that the TVPA does not provide a cause of action for attempted extrajudicial killing, the parties and the district court should focus on the TVPA's extrajudicial killing and torture causes of action in addressing the issue of legislative jurisdiction.

**\*\*\***

Viliena has raised a host of additional challenges to the trial proceedings and the damages awards. We address these questions in the event that they remain pertinent following remand. See Sellers v. Mineta, 358 F.3d 1058, 1065-66 (8th Cir. 2004) (addressing issues that may arise again on remand); Fed. Sav. & Loan Ins. Corp. v. Tex. Real Est. Couns., Inc., 955 F.2d 261,

---

[8] In this case, the district court allowed the claims for attempted extrajudicial killing to proceed, pointing to other decisions that had done the same. Boniface, 338 F. Supp. 3d at 67-68 (citing Doe v. Constant, 354 F. App'x 543, 547 (2d Cir. 2009); Warfaa v. Ali, 33 F. Supp. 3d 653, 666 (E.D. Va. 2014), aff'd, 811 F.3d 653 (4th Cir. 2016); and Yousuf v. Samantar, No. 1:04-cv-1360, 2012 WL 3730617, at \*16 (E.D. Va. Aug. 28, 2012)). But those decisions give no indication that any party challenged the availability of attempt liability under the TVPA; without any discussion of whether the TVPA provides a cause of action for attempted extrajudicial killing, we do not find those cases persuasive. See Doe, 354 F. App'x at 547 (affirming a finding of liability for attempted extrajudicial killing without analyzing whether the TVPA provides for attempt liability); Warfaa, 33 F. Supp. 3d at 666 (same, in allowing attempted extrajudicial killing claim to proceed); and Yousuf, 2012 WL 3730617, at \*16 (same, in entering judgment for attempted extrajudicial killing claim). We therefore reject plaintiffs' argument based on the same cases.

268-70 (5th Cir. 1992) (addressing damages arguments in event that judgment is reinstated on remand); see also Sec. & Exch. Comm'n v. Commonwealth Equity Servs., LLC, 133 F.4th 152, 171 (1st Cir. 2025) (same).  Our discussions will necessarily be limited by the district court's decision regarding legislative jurisdiction. Should the district court decide that the TVPA does not provide civil liability for acts committed by one foreign national upon another foreign national in a foreign country, then all of these issues would become moot because the causes of action would be dismissed.  If the district court determines that Congress had no such power, the plaintiffs would then be able to file a notice of appeal regarding the issue of legislative jurisdiction and the resulting dismissal.  Should the district court decide that Congress had the constitutional power to provide these causes of action, then the findings of liability would be affirmed for the reasons that follow, although Viliena would himself be able to appeal the district court's decision on remand.  See United States v. Richardson, 949 F.2d 851, 859 (6th Cir. 1991) (addressing issue so that, if trial court sustains conviction, an additional appeal need not be taken).  He would also be entitled to a new trial on damages, as we explain below.

## C. Evidentiary Issues

Viliena challenges the remaining two TVPA claims as resting on insufficient evidence.  When considering this

sufficiency challenge, we must view the evidence "in the light most favorable to the verdict and may reverse only if no reasonable person could have reached the conclusion arrived at by the jury." Alvarado-Santos, 619 F.3d at 132 (citing Valentín-Almeyda v. Mun. of Aguadilla, 447 F.3d 85, 95-96 (1st Cir. 2006)). We address Viliena's arguments in turn.[9]

## 1. Acting Under Color of Foreign Law

Viliena argues that there was insufficient evidence to meet one of the required elements for TVPA claims: that he be acting under color of foreign law.

The TVPA requires that the defendant be "[a]n individual . . . [acting] under actual or apparent authority, or color of law, of any foreign nation." 28 U.S.C. § 1350 note § 2(a). "To determine whether a defendant acted under color of foreign law, we look to 'principles of agency law and to

---

[9] Viliena makes an additional evidentiary argument that the district court abused its discretion in allowing expert Robert Maguire's testimony on political violence in Haiti. Three days before trial began, Viliena objected to Maguire's proposed testimony. The district court denied the motion from the bench as untimely as well as denying it on the merits, finding that the expert report met the requisite standard under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). On appeal, Viliena addressed only the merits of the decision and waited until his reply brief to refer to the issue of timeliness. But "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Because Viliena has waived any argument on the determinative issue of timeliness, we affirm the district court's denial.

jurisprudence under 42 U.S.C. § 1983.'"  Chowdhury v. Worldtel Bangl. Holding, Ltd., 746 F.3d 42, 52 (2d Cir. 2014) (quoting Kadic v. Karadzic, 70 F.3d 232, 245 (2d Cir. 1995)); see also H.R. Rep. No. 102-367, at 5 (1991), as reprinted in 1992 U.S.C.C.A.N. 84, 87 (directing courts to "look to" § 1983 jurisprudence in construing "color of law" in the TVPA).

Under § 1983, "[t]he traditional definition of acting under color of state law requires that the defendant . . . have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  West v. Atkins, 487 U.S. 42, 49 (1988) (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).  "[F]or purposes of the TVPA, an individual acts under color of law . . . when he acts together with state officials or with significant state aid.'"  Chowdhury, 746 F.3d at 52-53 (omission in original) (quoting Khulumani v. Barclay Nat'l Bank Ltd., 504 F.3d 254, 260 (2d Cir. 2007) (per curiam)).

We turn now to the trial evidence.  Viliena does not meaningfully contend with the specific evidence at trial.  Instead, he argues that there was "no evidence" that Viliena's actions resulted from an exercise of state power or that Viliena was a state actor with respect to the alleged conduct.

On the contrary, there was sufficient evidence for the jury to determine that Viliena acted under color of foreign law in

- 33 -

both attacks. First, the day that Viliena killed Eclesiaste Boniface started with a sanitation dispute to which Viliena was summoned in his official role as mayor. Viliena arrested the resident -- using his authority as mayor -- and brought her to a judge's house to resolve the dispute. At the judge's house, Viliena and his Director of City Hall, Hautefort Bajon, became angry with Boniface due to Boniface's role as a human rights advocate in the dispute. Viliena threatened Boniface and later fulfilled this threat by bringing an armed mob (including Bajon) to Boniface's home. Viliena himself shot Eclesiaste because Boniface was not there. When Boniface brought Eclesiaste's body to Viliena at City Hall the next day, Viliena called the police and ordered everyone to leave.

Viewing the facts in the light most favorable to the plaintiffs, as we must, there was sufficient evidence for a jury to find, by a preponderance of the evidence, that Viliena was acting under color of foreign law in the killing of Eclesiaste Boniface. See Alvarado-Santos, 619 F.3d at 127. Viliena's actions in arresting a resident and ordering the police to leave City Hall were possible only because of his power as mayor. See West, 487 U.S. at 49 ("the deprivation must be caused by the exercise of some right or privilege created by the State . . . or by a person for whom the State is responsible" (omission in original) (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982))). His

- 34 -

dispute with Boniface grew out of the threat that Boniface, as a human rights advocate, posed to him as mayor in the sanitation dispute. Viliena escalated this conflict by returning later, accompanied by Bajon -- one of his officials -- and shooting Eclesiaste. See Chowdhury, 746 F.3d at 52-53. A reasonable juror could have agreed with the plaintiffs' theory that Viliena abused his power as mayor, resulting in Eclesiaste's death.

Second, there was also sufficient evidence for the jury to determine that Viliena acted under color of foreign law during the April 8, 2008 radio station attack. From the evidence, a reasonable juror could have found that Viliena opposed the radio station because it was critical of him as mayor and because it was founded by an elected official from an opposing political party. After the civil protection agency -- which reported to him as the mayor -- refused his request to take over the radio station, Viliena led a mob of people to vandalize and steal the radio equipment. This crowd included Villeme Duclona and other KOREGA supporters. Viliena passed out guns to his supporters and told them to "attack." Viliena himself beat up both Ysemé and Martyr when he found each of them hiding, because he thought they would report who had destroyed the radio station.

Again viewing the evidence in the light most favorable to the jury verdict, there was sufficient evidence for the jury to agree with the plaintiffs that Viliena had perceived the radio

station as a threat to his mayoral power and that Viliena had abused his power in leading his political supporters to attack the radio station.

## 2. Secondary Liability

Viliena also argues that the TVPA does not provide for secondary liability and that the district court therefore erred in instructing the jury that they could hold Viliena responsible for the acts of others, under several specific theories of secondary liability: directing or ordering; solicitation; aiding and abetting; or conspiracy. Viliena further argues that, even if the TVPA does allow for secondary liability, there was insufficient evidence to permit the jury to find that Viliena was secondarily liable. Viliena seems to focus this argument on the radio station attack and to contest the idea that Viliena could be held liable for Duclona's actions in shooting Martyr and Ysemé. Since we have already determined that the judgments for attempted extrajudicial killing cannot stand, however, we need address this argument only with regards to the torture claims.[10] We will begin by addressing

_____

[10] It is not clear whether Viliena's arguments about secondary liability extend to Eclesiaste Boniface's murder. But we need not consider whether such an argument would be waived for lack of development because there was sufficient evidence of direct liability: one witness testified that Viliena himself shot Eclesiaste. Viliena points to another witness's testimony that Viliena told Bajon to shoot Eclesiaste, but a reasonable jury could have credited the first witness's testimony. See Alvarado-Santos, 619 F.3d at 127.

- 36 -

whether secondary liability is available under the TVPA before turning to the relevant evidence for the torture claims.

Before doing so, we note that we do not weigh each of the proposed theories of secondary liability because we conclude that the TVPA permits aiding and abetting liability and that there was adequate evidentiary support for this theory. In cases where "a single verdict question encompasses multiple theories, one of which is defective," our "usual" approach is to order a new trial. Cornwell Ent., Inc. v. Anchin, Block & Anchin, LLP, 830 F.3d 18, 33 (1st Cir. 2016) (quoting Gillespie v. Sears, Roebuck & Co., 386 F.3d 21, 29-30 (1st Cir. 2004)). But "we have generously applied the harmless error concept to rescue verdicts where we could be reasonably sure that the jury in fact relied upon a theory with adequate evidentiary support." Id. at 32 (emphasis omitted) (quoting Gillespie, 386 F.3d at 30). So, because there is sufficient evidence of aiding and abetting, it is unnecessary for us to walk through each additional theory to determine if any of them might be defective. See id.

### a. Aiding and Abetting Liability

We first ask whether the TVPA provides for aiding and abetting liability. Unlike federal criminal law, where Congress has provided a general aiding and abetting statute that applies to all federal criminal offenses, "Congress has not enacted a general civil aiding and abetting statute." Cent. Bank of Denv., N.A. v.

First Interstate Bank of Denv., N.A., 511 U.S. 164, 182 (1994); see also 18 U.S.C. § 2 (federal criminal aiding and abetting statute). Instead, Congress "has taken a statute-by-statute approach to civil aiding and abetting liability." Id. In Central Bank, the Court looked to the relevant statutory text and legislative history before determining that the challenged statutory provision (a securities fraud law) did not provide for aiding and abetting liability. Id. at 175-80; see also Doe I v. Cisco Sys., Inc., 73 F.4th 700, 744 (9th Cir. 2023) (discussing Central Bank and determining that the TVPA provides for aiding and abetting liability).

We therefore begin with the text of the TVPA. The TVPA provides for civil liability against someone who "subjects an individual to torture." 28 U.S.C. § 1350 note § 2(a)(1). To "subject" means "[t]o cause to undergo some action, agent, or operation." Subject, Black's Law Dictionary (12th ed. 2024); see also Subject, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/subject [https://perma.cc/7FCR-VNEF] (last visited June 23, 2025) (defining "subject" as "to cause or force to undergo or endure (something unpleasant, inconvenient, or trying)"). We agree with the Ninth Circuit, which has recently considered this question, that Congress's choice of words is meaningful. See Cisco Sys., 73 F.4th at 742. In drafting the TVPA, Congress could have restricted

- 38 -

its terms to direct liability by instead using the term "tortures" or "inflicts torture." See id. Congress's choice to use the broader phrase -- "subjects . . . to torture" -- "indicates that the statute contemplates liability for actions that helped bring about the torture but did not directly inflict it." Id.

The TVPA's legislative history also confirms this reading. The Senate Report noted:

> The legislation is limited to lawsuits against persons who ordered, abetted, or assisted in the torture. It will not permit a lawsuit against a former leader of a country merely because an isolated act of torture occurred somewhere in that country. However, a higher official need not have personally performed or ordered the abuses in order to be held liable. Under international law, responsibility for torture, summary execution, or disappearances extends beyond the person or persons who actually committed those acts -- anyone with higher authority who authorized, tolerated or knowingly ignored those acts is liable for them.

S. Rep. No. 102-249, at 8-9.

This reading of the statutory text aligns with opinions of the Supreme Court and other circuits that the TVPA is not limited to direct liability. The Supreme Court has noted that "the TVPA contemplates liability against officers who do not personally execute the torture or extrajudicial killing." Mohamad v. Palestinian Auth., 566 U.S. 449, 458 (2012) (citing Chavez v. Carranza, 559 F.3d 486, 499 (6th Cir. 2009) (addressing availability of command responsibility for TVPA claims)) (the

- 39 -

issue of secondary liability under the TVPA was not squarely before the Court). The Second, Ninth, and Eleventh Circuits have all found that the TVPA provides for various forms of secondary liability. See Chowdhury, 746 F.3d at 52 (holding that "agency theories of liability are available in the context of a TVPA claim"); Cisco Sys., 73 F.4th at 744 (holding that "the TVPA encompasses claims against those who aid and abet torture or extrajudicial killing"); Doe v. Drummond Co., 782 F.3d 576, 607-08 (11th Cir. 2015) (concluding that "secondary or indirect theories of liability recognized by U.S. law are available for claims brought under the TVPA" and affirming the jury verdict under aiding and abetting liability); see also Chavez, 559 F.3d at 499 (affirming under command responsibility).

## b. Whether the Evidence was Sufficient

Having confirmed that aiding and abetting is available as a theory of liability under the TVPA, we turn to Viliena's argument that the evidence was insufficient to find him secondarily liable for the torture of Martyr and Ysemé.

Aiding and abetting in tort law generally requires that "the defendant ha[s] given knowing and substantial assistance to the primary tortfeasor." Twitter, Inc. v. Taamneh, 598 U.S. 471, 491 (2023). The plaintiffs also must prove that the underlying tort has occurred. See id. at 494. The district court's

instructions to the jury tracked this case law. It told the jury that the plaintiffs must prove, by a preponderance of the evidence:

> 1. That one or more of the alleged wrongful acts was committed.
> 2. That Defendant Viliena committed or gave substantial assistance to the person or persons who committed or caused one or more of the alleged wrongful acts;
> And 3. That the Defendant Viliena knew that his actions would assist in the illegal or wrongful activity at the time he provided the assistance.

See also Cabello v. Fernández-Larios, 402 F.3d 1148, 1158 (11th Cir. 2005) (holding that a plaintiff could prove indirect liability under the TVPA if he demonstrated, by a preponderance of the evidence, that one of the wrongful acts underlying the claim was committed and that the defendant had knowingly and substantially assisted a person who committed the wrongful act).

Applied here, there was sufficient evidence for a reasonable jury to find Viliena liable for the torture of Ysemé and of Martyr, including that Viliena aided and abetted Duclona in shooting Ysemé and Martyr. The jury heard testimony that Viliena personally handed out guns to a mob of twenty to thirty people -- including handing a shotgun to Duclona -- before telling them to "attack" the radio station. After breaking into the radio station, Viliena himself beat and pistol-whipped Martyr, and he assaulted Ysemé too, to the point that Ysemé felt like his bones were "cracking." Viliena dragged Ysemé out onto the porch and

ordered someone to restrain him until they could hang Ysemé in public; when Ysemé managed to break away, Viliena told Duclona to shoot Ysemé. Duclona did so, with the shotgun that Viliena had given him. Similarly, Viliena instructed Duclona to shoot Martyr, insisting when Duclona showed signs of hesitation. Duclona then shot Martyr.

There was no dispute at trial that the underlying wrongful act here -- Duclona shooting Martyr and Ysemé -- actually happened. See Taamneh, 598 U.S. at 494 (aiding and abetting liability must rest on underlying tort). The testimony that Viliena gave Duclona the shotgun and told him to shoot both Martyr and Ysemé was sufficient for the jury to conclude that Viliena had given "knowing and substantial assistance" to Duclona. Id. at 491. In the face of this evidence, Viliena's argument that there were "no facts" enabling the jury to find him secondarily liable for torture is unconvincing. Indeed, the evidence demonstrating that Viliena aided and abetted Duclona in shooting both victims supplemented his own direct liability in beating them. The evidence was therefore sufficient to find Viliena liable for the torture of Martyr and Ysemé.

### D. Damages

Because the attempted extrajudicial killing cause of action should not have proceeded to trial, we consider whether the

damages awards may need to be recalculated even if the remaining TVPA causes of action stand.

## 1. Damages for Nissandère Martyr and Juders Ysemé

The jury provided single damages awards to Nissandère Martyr and Ysemé for the torture and attempted extrajudicial killing claims ($1.75 million to Nissandère Martyr and $1.25 million to Ysemé).[11] Plaintiffs argue that, even if we determine that the judgments for attempted extrajudicial killing should not stand -- as we have -- we can affirm the single damages award on another basis. Because Viliena does not contest the torture claims, they argue, the damages award can be affirmed on that basis alone. (Citing Molloy v. Blanchard, 115 F.3d 86, 90 (1st Cir. 1997) ("The jury provided a single damages award for both claims, and so long as Plaintiff is found entitled to have prevailed on either of the two claims, the award stands, with no alteration in the amount of damages regardless of whether one or both claims are upheld.")).

In general, a combined damages award for multiple claims should be vacated where additional conduct supported a claim that has been vacated. See Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 200-01 (1st Cir. 1996) (vacating

---

[11] Given the format of the jury verdict form, although the jury reached separate liability findings as to torture and attempted extrajudicial killing, it awarded a combined damages calculation for both causes of action.

entire damages award "comprising awards for both price discrimination and monopolization claims" because "the jury may well have weighed harms resulting from conduct that was pleaded with respect to the monopolization offense . . . but would have been additional to harms resulting from price discrimination, the claim we uphold"). Conversely, even where a plaintiff is "entitled to have prevailed on" a single claim, we may affirm a combined damages award where the same conduct underlies multiple claims and the damages would be the same. Molloy, 115 F.3d at 90-91 (affirming combined damages award based on valid gender discrimination claim, without deciding procedural due process claim, because "[t]he same conduct underlay both" and "the jury's damages award would be the same under either or both liability theories").

In this instance, we think that even if the district court allows the TVPA claims to proceed after addressing legislative jurisdiction, fairness would require a new damages award for Ysemé and Nissandère Martyr based on torture alone. The jury was instructed to determine compensatory damages using "fairness and common sense," considering -- among other factors -- the plaintiff's "loss or injury," "shame, mortification, humiliation, indignity[,] . . . mental and emotional distress[,] and "any harm to [his] reputation." True, much or all of the same conduct and the same medical expenses

- 44 -

underlay the torture claim and the now-defunct attempted extrajudicial killing claim. But we cannot rule out that a jury considering liability for both torture and "attempted extrajudicial killing" would grant higher damages for these difficult-to-quantify factors than a jury considering liability for torture alone. For example, the jury may well have granted higher damages for emotional distress to a plaintiff who was the victim of torture and an attempted extrajudicial killing than a plaintiff who was tortured. The implications of an attempted killing are more extreme, even when compared to the horrors of torture. Due to the highly charged nature of an accusation of "attempted extrajudicial killing," we determine that these damages awards should be reassessed if the TVPA torture and extrajudicial killing claims stand following remand. See Hormel v. Helvering, 312 U.S. 552, 557 (1941) ("Orderly rules of procedure do not require sacrifice of the rules of fundamental justice.").[12] However, we again emphasize that whether a new trial on damages is required depends upon the resolution of the legislative

---

[12] Viliena argues that the TVPA does not provide for punitive damages. However, this argument consists of a single sentence and the case he cites is not on point; this argument is therefore waived for lack of development. See Zannino, 895 F.2d at 17. Similarly, he argues in two sentences that the punitive damages award here was "grossly excessive" but does not explain why. This conclusory statement also constitutes waiver. See id.

jurisdiction issue that the district court must address in the first instance on remand.

## 2. Additional Damages Awards

The jury awarded compensatory damages to Boniface for the extrajudicial killing of his brother, Eclesiaste Boniface. This finding of liability will stand if the district court holds that there is legislative jurisdiction for this claim. The jury also awarded punitive damages. Given the potential that the erroneous attempted extrajudicial killing claim may have impacted the rest of the jury's calculations, we consider whether these additional damages awards would still stand.

"An appellate court has broad discretion to remand for a new trial on all, or only some, of the issues in the case." Bergus v. Florian, 120 F.4th 14, 29 n.12 (1st Cir. 2024) (quoting Dopp v. HTP Corp., 947 F.2d 506, 518 (1st Cir. 1991)). "A new trial may not, however, be limited to fewer than all the issues unless it clearly appears that the issues to be retried are so distinct and separable from the other issues that a trial of those issues alone may be had without injustice." La Plante v. Am. Honda Motor Co., 27 F.3d 731, 738 (1994).

Should the district court allow the extraterritorial TVPA claims here to proceed, we think the jury must recalculate all of the damages awards, not only those to Nissandère Martyr and Ysemé. The issue of Boniface's damages is not so distinct from

- 46 -

Nissandère Martyr's and Ysemé's damages that a separate retrial would avoid injustice. See id. While Boniface's compensatory damages award was not "directly undermined" by the error in allowing the attempted extrajudicial killing claim to proceed to trial, removing that error may "improve[] the atmosphere for the defense." Gillespie, 386 F.3d at 35-36. It is difficult to determine how the jury's consideration of the attempted extrajudicial killing claims may have affected the rest of the damages calculations. See Mandel v. Bos. Phoenix, Inc., 456 F.3d 198, 211 (1st Cir. 2006) (ordering a full retrial, even though the error "arguably" did not influence one of the jury's findings, because the evidence related to that finding "may have affected other aspects of the trial"). And because a new trial would already be required for Nissandère Martyr's and Ysemé's damages, retrying the remainder of the damages awards would require "only marginally greater resources." See id. Therefore, a new trial for all of the damages -- including Boniface's compensatory damages and the punitive damages -- would minimize concerns about judicial waste.[13] See Dopp, 947 F.2d at 518-19.

---

[13] Because any damages award would have to be retried, Viliena's argument that the district court abused its discretion in denying remittitur is moot.

## IV. Conclusion

The district court's order denying the motion for reconsideration is **affirmed** in part and **vacated** in part. This case is **remanded** for proceedings consistent with this opinion.

**-Concurring Opinion Follows-**

**LYNCH**, **Circuit Judge**, **concurring**.  I join the court's fine opinion, including its remand of the questions of whether the TVPA creates causes of action for torture and extrajudicial killing among Haitian nationals, not U.S. citizens, for activities which took place entirely in Haiti and where, as the district court correctly held, Haitian national plaintiffs' claims do not "sufficiently 'touch and concern' the United States."  That holding is the law of the case.[14]

I write separately to highlight some of the very difficult issues to be faced on remand.  The remanded issues necessarily first ask whether Congress intended to create such causes of action under the numerous canons of statutory construction applicable to the issue.  If so, the next question must be addressed of whether Congress had the power to do so under the U.S. Constitution.

The Supreme Court very recently reaffirmed its repeated warnings that courts must be extremely cautious about construing federal statutes to allow extraterritorial applications.  See Fuld v. Pal. Liberation Org., 606 U.S. ___, __, 145 S. Ct. 2090, 2106 (2025) (stating that "hal[ing] foreign defendants into U.S.

_____

[14]     Because plaintiffs fail to appeal the district court's finding that their claims did not "sufficiently 'touch and concern' the United States," this is the law of the case, and is pertinent under Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108, 124-25 (2013).

courts" requires "conduct closely related to the United States" and declining to "bless more attenuated assertions of jurisdiction"); see also Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108 (2013); Sosa v. Alvarez-Machain, 542 U.S. 692 (2004).

A serious question is presented of whether the TVPA uses the clear language needed to rebut the presumption against extraterritorial application here, in contrast with the clear language used in other statutes. That presumption necessarily implicates foreign policy consequences, which the Supreme Court has instructed must be taken into account. Congress appears to have justified the enactment of the TVPA to implement the United Nations Convention Against Torture (CAT), but it appears the CAT does not require, and indeed may be in tension with, creation of the causes of action here. Also raised are questions of constitutional avoidance and compliance with international law, given notions of prescriptive comity and the law of nations.

**I.**

The "presumption against extraterritorial application . . . provides that '[w]hen a statute gives no clear indication of an extraterritorial application, it has none.'" Kiobel, 569 U.S. at 115 (alteration in original) (quoting Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247, 255 (2010)). Indeed, "[i]t is a 'rare statute that clearly evidences extraterritorial effect despite lacking an express statement of

- 50 -

extraterritoriality.'" Abitron Austria GmbH v. Hetronic Int'l, Inc., 600 U.S. 412, 420 (2023) (quoting RJR Nabisco v. European Cmty., 579 U.S. 325, 340 (2016)).

"[W]eighty concerns underl[ie] the presumption against extraterritoriality." Kiobel, 569 U.S. at 123. The presumption "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord" and "retaliative action." Id. at 115-16 (first quoting EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248 (1991); and then quoting Benz v. Compania Naviera Hidalgo, S.A., 353 U.S. 138, 147 (1957)). It also ensures that "the Judiciary does not erroneously adopt an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches."[15] Id. at 116.

Under Fuld and Kiobel, there is a serious question of whether the TVPA contains the necessary "clear indication" to sustain the extraterritorial applications urged by plaintiffs,

---

[15] Even "[w]hen a statute provides for some extraterritorial application," the presumption "operates to limit that provision to its terms." Kiobel, 569 U.S. at 121-22 (quoting Morrison, 561 U.S. at 265); see id. ("[T]he existence of a cause of action against [pirates] is [not] a sufficient basis for concluding that other causes of action under the ATS reach conduct that does occur within the territory of another sovereign; pirates may well be a category unto themselves."); see also RJR Nabisco, 579 U.S. at 338 (holding that "the presumption against extraterritoriality ha[d] been rebutted -- but only with respect to certain applications of the statute").

particularly when compared with the language Congress used in the U.S. Code provision criminalizing torture and in other statutes. See Kiobel, 569 U.S. at 115. The TVPA, enacted as a note to the ATS, appears to contain no explicit statement that it applies to entirely foreign conduct, such as on these facts. The absence of such language "strongly suggests that [Congress] meant for [the TVPA] to work differently." See Stanley v. City of Sanford, 606 U.S. ___, ___, 145 S. Ct. 2058, 2064 (2025); see also Medina v. Planned Parenthood S. Atl., 606 U.S. ___, ___, 145 S. Ct. 2219, 2235 (2025) (clear language in other statutes shows that "Congress knows how to" use such language). And even when Congress used such language in other statutes, it included limitations.[16]

In contrast to the text of the TVPA, which is a civil damages statute, the U.S. criminal code does contain explicit extraterritorial application language and subjects even that language to limitations. See Torture, 18 U.S.C. § 2340A(a), (b) (criminalizing torture "outside the United States" "irrespective of the nationality of the victim or alleged offender" with the limitation that "the alleged offender [be] present in the United States"). In the civil cause of action to challenge acts of international terrorism, Congress likewise expressly defined an

___

[16] See Medina, 145 S. Ct. at 2235 (construing the statute at issue differently than another statute because "Congress's work in the two provisions could not have been more different").

- 52 -

act of international terrorism as one which "occur[s] primarily outside the territorial jurisdiction of the United States," 18 U.S.C. § 2331(1), with the limitation that the plaintiff be a "national of the United States." See Terrorism, Civil Remedies, 18 U.S.C. § 2333(a). And in many other contexts, also unlike in the TVPA, Congress clearly stated its intent to apply statutes extraterritorially in certain limited circumstances. See, e.g., Genocide, 18 U.S.C. § 1091 (criminalizing genocide "regardless of where the offense is committed" if the alleged offender is a U.S. national, permanent resident, stateless person habitually residing in the U.S., or is present in the U.S); Peonage, Slavery, and Trafficking in Persons, Additional Jurisdiction in Certain Trafficking Offenses, 18 U.S.C. § 1596 (creating "extra-territorial jurisdiction" over certain trafficking offenses if, inter alia, "an alleged offender is present in the United States, irrespective of the nationality of the alleged offender").

## II.

The Supreme Court has warned in interpreting statutes that "providing a private civil remedy for foreign conduct creates a potential for international friction beyond that presented by merely applying U.S. substantive law to that foreign conduct."[17]

---

[17] The defendant here was recently convicted, in a different case before a different jury, of visa fraud in violation of 18 U.S.C. § 1546(a). Specifically, the jury found defendant had knowingly and falsely answered "no" in response to a question

<u>RJR Nabisco</u>, 579 U.S. at 346-47; <u>see also</u> <u>Sosa</u>, 542 U.S. at 727-28 ("[C]laim[ing] a limit on the power of foreign governments over their own citizens, and . . . hold[ing] that a foreign government or its agent has transgressed those limits" has "adverse foreign policy consequences.").

In construing statutes, courts also must take into account what Justice Thomas, concurring in <u>Fuld</u>, described as the risk that "countries may decide to enact '"retaliatory" jurisdictional provisions' that 'empower [their] national courts to exercise jurisdiction over [American citizens] in circumstances where [American] courts . . . would have asserted jurisdiction.'" 145 S. Ct. at 2119 (alterations and omission in original) (quoting G. Born, <u>Reflections on Judicial Jurisdiction in International</u>

---

asking whether he had "ordered, carried out, or materially assisted in extrajudicial and political killings and other acts of violence against the Haitian people" on the form needed to enter the United States and to obtain lawful permanent resident status. He has been sentenced to nine years' imprisonment and will be subject to deportation proceedings upon the completion of his sentence. This means that plaintiffs' assertions that he had entered the United States legally are wrong. The court should take judicial notice of these important facts. <u>See</u> <u>Medtronic Med. CR SRL</u> v. <u>Feliciano-Soto</u>, 59 F.4th 51, 53 n.2 (1st Cir. 2023). This country prohibits the admission of individuals who committed acts of torture and extrajudicial killing, and defendant has been convicted of visa fraud on those grounds. <u>See</u> 8 U.S.C. § 1182(a)(3)(E)(iii). Those provisions of the Immigration and Nationality Act adequately address these concerns. Furthermore, defendant was tried before a Haitian court for the torture and extrajudicial killing on the facts alleged here and was acquitted of those charges. Given these facts, in my view, there is no basis to think that this case presents an instance of the United States being at risk of becoming a safe haven for torturers or murderers.

Cases, 17 Ga. J. Int'l & Comp. L. 1, 15 (1987)); see also Kiobel, 569 U.S. at 124 (declining to recognize cause of action in part because it "would imply that other nations, also applying the law of nations, could hale our citizens into their courts for alleged violations of the law of nations occurring in the United States, or anywhere else in the world"); Brief for Federal Petitioner at 47-48, Fuld, 145 S. Ct. 2090 (No. 24-20), 2025 WL 389042, at *47-48 (acknowledging that the expansive exercise of U.S. jurisdiction over suits involving foreign nationals "could invite other countries to assert blanket jurisdiction over U.S. nationals").

The Supreme Court has further warned against "thrust[ing] [the Judiciary] into the unappetizing task of 'navigating foreign policy disputes belong[ing] to the political branches.'" Abitron, 600 U.S. at 427 (third alteration in original) (quoting Jesner v. Arab Bank, PLC, 584 U.S. 241, 281 (2018) (Gorsuch, J., concurring in part and concurring in judgment)); see also Sosa, 542 U.S. at 747 (Scalia, J., concurring in part and concurring in judgment) ("[H]olding open the possibility that judges may create rights where Congress has not authorized them to do so . . . countenances judicial occupation of a domain that belongs to the people's representatives.").

## III.

In construing a statute, courts also must consider "Congress's statement of purpose." Bittner v. United States, 598

U.S. 85, 98 (2023); see also id. at 98 n.6 ("A preamble, purpose clause, or recital is a permissible indicator of meaning." (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 217 (2012))). The preamble of the TVPA states that it is "[a]n Act to carry out obligations of the United States under the United Nations Charter and other international agreements pertaining to the protection of human rights." Pub. L. No. 102–256, 106 Stat. 73. That purpose is carried out by the TVPA without construing the statute to allow the two extraterritorial causes of action at issue here. Indeed, the CAT specifically declined to require signatories to create such civil causes of action for torture, in contrast with criminal prosecutions.

The ratification history of the CAT shows that it specifically declined to require civil causes of action for damages for the claims asserted here.[18] The U.S. Senate's ratification of the CAT was subject to the understanding that article 14 "requires a State Party to provide a private right of action for damages only for acts of torture committed in territory under the

---

[18] Without discussing whether plaintiffs' causes of action run afoul of the Restatement of Foreign Relations or whether the Restatement (Third) of Foreign Relations Law of the United States (1987) or Restatement (Fourth) of Foreign Relations Law of the United States (2018) would apply to this question, even under the Fourth Restatement, "the permissibility and limits of universal civil jurisdiction remain controversial." See Restatement (Fourth) of Foreign Relations Law § 413, cmt. d (Am. L. Inst. 2018).

jurisdiction of that State Party." Resolution of Ratification, Treaty Doc. 100-20 (1990) (emphasis added). The Executive Branch explained that "[a]rticle 14 was in fact adopted with express reference to 'the victim of an act of torture committed in any territory under its jurisdiction,'" but the "committed in any territory under its jurisdiction" clause in the proposed legislation, which was altered to become the CAT, had been "deleted by mistake." U.S. Dep't of State, Summary and Analysis of the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, at 13-14; see also Torture Victim Protection Act of 1989: Hearing on S. 1629 and H.R. 1662 Before the Subcomm. on Immigr. & Refugee Affs., S. Comm. on the Judiciary, 101st Cong. (1990) (statement of John O. McGinnis, Deputy Assistant Att'y Gen., Off. of Legal Couns., U.S. Dep't of Just.) (stating that "the negotiating record of the [CAT] supports the view that" the CAT "requir[es] each state party to provide means of redress and compensation, such as a civil suit, for acts taking place within their own territory, and specifically it declines to make that requirement extraterritorial" (emphasis added)).

Indeed, nations which are parties to the CAT have objected to similar extraterritorial applications of the ATS. See

*Kiobel*, 569 U.S. at 124 (referencing "recent objections to extraterritorial applications of the ATS" by seven nations).

**IV.**

The canon of constitutional avoidance provides that courts must "ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided." *Perttu* v. *Richards*, 605 U.S. ___, ___, 145 S. Ct. 1793, 1800 (2025) (alteration in original) (quoting *Monterey* v. *Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999)). Relatedly, courts "ordinarily construe[] ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations." *F. Hoffmann-La Roche Ltd.* v. *Empagran S.A.*, 542 U.S. 155, 164 (2004); *see also* *Murray* v. *Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains.").

There is a serious question of whether extending the TVPA to these facts violates notions of "prescriptive comity," which is "the respect sovereign nations afford each other by limiting the reach of their laws," which "courts assume . . . has been exercised when they come to interpreting the scope of laws their legislatures have enacted." *See* *Hartford Fire Ins. Co.* v. *California*, 509 U.S. 764, 817 (1993) (Scalia, J., dissenting).

This concurrence is meant to provide helpful guideposts on remand, as I see the issues and arguments.